1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JASON ROSS GILLEY,                      No.  2:18-cv-1162 JAM KJN P

12                    Petitioner,

13        v.                                  FINDINGS & RECOMMENDATIONS

14    RAYMOND MADDEN,

15                    Respondent.

16

17    I.  Introduction

18            Petitioner is a state prisoner, proceeding with[1] counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2013 conviction for first

20    degree murder.  Petitioner was sentenced to life without the possibility of parole, plus a

21    consecutive twenty-five years to life for the use of a firearm.  Petitioner claims that (1) his

22    constitutional due process rights were violated when the police overbore his will by making

23    implied promises by telling him he had an "opportunity" to "help himself," and by impliedly

24    threatening his family; (2) his constitutional rights to due process and a fair trial were violated

25    when the trial court permitted the introduction of evidence of petitioner's fetish for women's

26    underwear; (3) the trial court abused its discretion in denying petitioner's motion for mistrial and

27    _____

28    [1] Petitioner originally filed his petition for writ of habeas corpus pro se.  On July 19, 2018,
      counsel was appointed/substituted to represent petitioner in these proceedings.  (ECF Nos. 15-16.)

1    that the prosecutor committed misconduct in eliciting testimony of a detective concerning a

2    canine search; (4) the trial court failed to instruct the jury with CALCRIM No. 224 as required;

3    (5) petitioner's constitutional rights were violated when the jury requested and received readback

4    of witness testimony outside his presence; and (6) counsel provided ineffective assistance during

5    pretrial, trial and sentencing proceedings.  After careful review of the record, this court concludes

6    that the petition should be denied.

7    II.  <u>Procedural History</u>

8            On October 2, 2013, a jury found petitioner guilty of first degree murder (Cal. Pen. Code,

9    § 187); the jury also found the special circumstances of kidnapping (Cal. Pen. Code,

10   § 190.2(a)(17)(B)) and personal use or discharge of a firearm allegation (Cal. Pen. Code,

11   §§ 12022.53(d)) to be true.  (ECF No. 30-3 at 217-219.)  On November 4, 2013, petitioner was

12   sentenced to life without the possibility of parole for the first degree murder, followed by a

13   consecutive term of twenty-five years to life in state prison for the discharge of a firearm during

14   commission of the murder.  (ECF No. 30-4 at 95-96.)

15           Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

16   District.  The Court of Appeal affirmed the conviction on January 27, 2017.  (ECF No. 30-17.)

17           Petitioner filed a petition for review in the California Supreme Court, which was denied

18   on April 12, 2017.  (ECF No. 19.)

19           Thereafter, on September 27, 2017, petitioner filed a petition for writ of habeas corpus in

20   the San Joaquin County Superior Court.  (ECF No. 30-20.)  That court denied the petition on

21   October 18, 2017.  (ECF No. 20-21.)

22           On November 9, 2017, petitioner filed a petition for writ of habeas corpus with the Third

23   District Court of Appeal.  (ECF No. 30-22.) The state intermediate appellate court denied the

24   petition on November 16, 2017.  (ECF No. 30-23.)

25           Petitioner then filed a petition for writ of habeas corpus with the California Supreme

26   Court on January 2, 2018.  (ECF No. 30-24.)  The state's highest court denied the petition on

27   March 21, 2018.  (ECF No. 30-25.)

28           Petitioner filed the instant petition on May 7, 2018.  (ECF No. 1.)

III.  Facts[2]

In its unpublished memorandum and opinion affirming petitioner's judgment of

conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

following factual summary:

> On July 19, 2011, 23-year-old Dalene Carlson moved to Stockton
> from Idaho to find a job and go to school. [Fn. 2 omitted.]  Dalene
> lived with her aunt in Stockton.
>
> Shortly after arriving in Stockton, Dalene began dating Jacob
> Evangelisti. By early August, Dalene appeared to have lost interest
> in Jacob and had turned her affections toward James Cosens. James
> had been friends with defendant for 17 years, and at all relevant times
> herein lived with defendant, who lived with his grandmother and
> mother. Dalene, defendant, James, and Jacob regularly frequented
> Finnegan's Bar in Stockton.
>
> At approximately 10:00 p.m. on August 6, 2011, Dalene left her
> aunt's house to go to Finnegan's Bar with a friend. Dalene's friend
> drove her to the bar, but the two separated after they arrived. Dalene's
> friend assumed that he would drive Dalene home, but Dalene later
> informed him that she had a ride home. She did not say with whom.
> Her friend never saw her again.
>
> Jacob arrived at Finnegan's Bar about 30 minutes before Dalene. The
> two spoke briefly, and Jacob gave Dalene some money for drinks.
> When Jacob left the bar, he telephoned Dalene, who told him that she
> had left with defendant to grab a bottle and go back to his house to
> "take shots." Jacob did not believe her and texted defendant, "Is
> Dalene with you?" Defendant responded in the negative and said he
> was at the hospital with his son.
>
> After arriving at Finnegan's Bar, Dalene texted James and told him
> that she wanted him to go to Finnegan's Bar. He responded that he
> could not go because he was with his "brother" Christian.
>
> At 12:05 a.m. that morning, August 7, 2011, Dalene texted James,
> "Im crashing at jasons on the couch." James responded, "Lmao wow
> ok." Dalene then texted, "U wann join?" James declined. At 12:46
> a.m. Dalene texted James, "We're getting a bottle of jaeger i think,"
> and James responded, "Lmfao ... he tryin to get u wasted lmfao ...
> really have fun wit that."
>
> Shortly after 1:00 a.m., defendant texted Dalene, "Ready." She
> responded, "Yep," and defendant replied, "Lets go then." A few
> minutes later, defendant texted Dalene, "Go to the car."

---

[2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
District in <u>People v. Gilley</u>, No. C075136, filed January 27, 2017, a copy of which was lodged by
respondent on April 16, 2019 (ECF No. 30-20).

At 1:28 a.m., James texted Dalene, "I am sorry but u just told me u wernt goin home wit a guy and then say ur goin home wit jason who wants u pretty bad ... and i am over here thinkin bout u." James told Dalene "not to get drunk to where u do something stupid ... i dont want u drunk hookin up wit him ... that would hurt." Dalene and James continued to exchange text messages until 2:15 a.m.

At about 5:00 a.m., Jacob spoke to Dalene, who told him she did not want to be at defendant's house anymore. At 5:02 a.m., Dalene texted Jacob, "Im comiin home," and he responded "K." A few minutes later, she texted him, "I wuv u," and he replied, "I love you dalene." At 6:31 a.m., Jacob texted Dalene, "?" She did not respond.

At 8:23 a.m., James texted Dalene, "U ok?" She did not respond. At 9:22 a.m., James texted her, "I just wana say good morning and I hope ur ok u stopped textin me lasnight hope u didn't do anything dumb ... miss u tons ... text me when ur alive lol." At 9:25 a.m., James received the following text from Dalene's phone, "No." James responded, "No? No wat" and "I am lost." James continued to text Dalene for the next hour but did not receive a response. Finally, at 10:27, James texted Dalene, "Do u not wana talk to me.. Is that wat the no was for? Please tell me." At 10:29 a.m., he received the following response, "i do." James then asked, "So wat happened last night? Tell me the truth," and received the following response, "When." James replied, "When you went home wit jason," and received the following response, "I didnt go with him went with johny." At 11:17 a.m., James received a text from Dalene's phone stating that she was walking home from Country Club Boulevard in Stockton, which would have been a 30–45 minute walk. The last text from Dalene's phone was sent at 11:25 a.m., while she supposedly was walking home.

Dalene's aunt began calling her after 3:30 a.m. on August 7, 2011. She called her every hour but got no answer. She also texted and left voice mail messages but never got a response. At approximately 11:30 p.m. that night, Dalene's aunt contacted the Stockton Police and reported Dalene missing.

On the evening of August 7, 2011, after learning that Dalene had not returned home, James went to Finnegan's Bar and viewed surveillance video taken in and around the bar to determine who Dalene left with that morning. He recognized Dalene and defendant on the videotapes, both individually in the bar and together outside the bar. Dalene was last seen on the videotape from Finnegan's Bar at 1:15 a.m. on August 7, 2011. Surveillance footage from the Stockton Food–4–Less showed defendant and Dalene at the store early that morning, and a receipt for the same Food–4–Less found in defendant's garage showed a purchase of Jägermeister and two Monster Energy drinks at 1:28 a.m. on August 7, 2011.

On August 9, 2011, defendant was interviewed at his home by Detectives Larry Lane and James Knief of the Stockton Police Department. Defendant told the detectives that he was with Dalene at Finnegan's Bar on the night of August 6, 2011, until early the next morning. He offered her a ride home, but she declined. He left the

4

bar around 1:00 a.m. after receiving a message from his grandmother informing him that his son was sick. He said his last contact with Dalene was at 1:10 a.m. on August 7, 2011, when he texted her about a ride.

Following defendant's arrest on August 14, 2011, defendant was interviewed by Detective Knief and Detective Bradley Burrell. The interview was videotaped and played for the jury. Defendant initially told the detectives the same story he told Detective Lane, namely that he left the bar alone around 1:00 a.m. after receiving a text from his grandmother informing him that his son was ill. Later, he admitted leaving the bar with Dalene, buying a bottle of Jäegermeister at Food–4–Less, and taking her back to his house, where they consumed the entire bottle and had sex. [FN. 3 omitted.] Defendant explained that after they had sex, Dalene became upset, said "it" should not have happened, and started to walk home. Defendant got in his grandmother's car and picked her up at the corner near his house. Just before they reached Charter Way, near where Dalene lived, Dalene either got out or attempted to get out of the car. Thereafter, defendant drove south to Modesto with Dalene in the car. Dalene was "irate" and demanded to be let out of the car the entire drive, which lasted 30 to 45 minutes. Dalene told defendant that he was "horrible" and a "piece of garbage" and said that she could not believe that he did "this." When defendant pulled off the freeway in Modesto and attempted to make a U-turn, Dalene got out of the car and took off running. That was the last time he saw her.

Defendant was released on August 18, 2011, following his arrest, and on August 22 went to the police station to report a lost or stolen wallet. Detective Robert Faine saw defendant and asked defendant to accompany him and retrace defendant's route on the day Dalene disappeared. Defendant agreed and directed Faine to go eastbound on Highway 4, then southbound on Highway 99. He said that he chose Highway 99 because Dalene lived off of Charter Way. When they passed the Charter Way exit, Faine asked defendant why he did not take it, and defendant said he did not know why. Defendant said that he was speeding to keep Dalene from jumping out of the car. She was irrational, screaming, and trying to get out of the car. By the time they got to Ripon, Dalene had settled down, and defendant thought it would be safe to get off the freeway. When he exited the freeway at the Maze Street exit in Modesto, she jumped out of the car. Faine asked defendant why he did not try and get her, and defendant said that the car behind him was honking and he needed to get home, so he got back on the freeway. Defendant then said that he looked for Dalene for about 10 or 15 minutes but had to leave because he was running out of gas. He drove back to Arch Road in Stockton to get gas. Surveillance video revealed that defendant stopped at a gas station near the Arch Road exit off Highway 99 in Stockton at 10:46 a.m. on August 7, 2011.

On October 15, 2011, human remains, which were later determined to be those of Dalene, were discovered in a cornfield about 64 feet from Lone Tree Road in the Escalon. Sarah Yoshida, a senior criminalist with the Department of Justice, was dispatched to the crime scene that afternoon. Yoshida found several bones, including

5

a skull, rib bones, a jaw, numerous vertebrae, and foot and leg bones. She also found a human torso and a clump of hair. A black bra was found in the area between the remains and Lone Tree Road. Five .22–caliber cartridge cases were found just southeast of where the human remains were found.

Dr. Bennet Omalu, a medical examiner for San Joaquin County, was called to the crime scene around 9:00 p.m. that night. He saw the body and requested that the ground underneath it be excavated 18 inches. The soil was secured in a body bag and X-rayed. Two .22–caliber bullets were located in the excavated soil. Dr. Omalu performed an autopsy on Dalene's remains. He opined that Dalene was shot in the cornfield where her remains were found and that the bullets went through her body and embedded in the soil directly underneath her or stayed inside the body and fell out as the body decomposed. There was a gunshot entrance wound to the back of the head, consistent with an execution style shooting. A bullet was discovered in the base of the anterior fossa of the skull. There was a ring of black soot surrounding the gunshot wound, indicating "it was either a contact or a close-range gunshot wound." Dalene's fingers, fingernails, and jewelry were entangled in her hair, and based on that and the location of the gunshot wound, Dr. Omalu opined that Dalene had her hands and fingers around her head when she was shot. X-rays of the residual trunk revealed two bullets in the lower abdominal cavity. One was closer to the pelvis, and a second was in the spinal canal. Dr. Omalu concluded that Dalene "died as a result of a gunshot wound of the head and gunshot wounds of the trunk were contributory factors to her death." He also opined that the decomposition of her body was consistent with her being deceased on August 7, 2011.

In late July 2011, just prior to Dalene's disappearance, defendant asked his uncle for defendant's handgun to go shooting with a friend. The gun was originally purchased by defendant's grandfather, was passed down to defendant, and was being stored in defendant's uncle's gun safe. Defendant's uncle gave him the gun, a Jennings .22–caliber semi-automatic handgun. Defendant returned the gun sometime between August 8 and 11, 2011, after Dalene had gone missing.

About a week prior to Dalene's disappearance, defendant told Donald Bennett that he wanted to shoot a gun that he had received from his grandfather. Bennett and defendant went to the diverting canal off of Main Street, where defendant shot the gun. Bennett identified the gun defendant obtained from his uncle as the gun defendant used at the diverting canal. On October 18, 2011, Tammy Chaney, a field evidence technician for the Stockton Police Department, was dispatched to diverting canal off of Main Street where she collected expended .22–caliber cartridge cases.

Yoshida also testified as an expert in the area of ballistics and firearms generally. She explained that ammunition is comprised of the bullet, the cartridge case, and the powder, which is contained inside the cartridge case. When a semi-automatic or fully-automatic firearm is fired, the cartridge case is expelled from the firearm, and

6

the bullet is the part that comes out the muzzle of the barrel. The hammer (or firing pin) of the gun strikes the cartridge, which ignites the primer, which ignites the gunpowder, which propels the bullet out of the barrel. The firing pin, the extractor hooks, and the force of the explosion all cause the cartridge to be marked. The bullet travels down the chamber and sometimes there are marks made on the bullet "based on what's going on in the barrel." The number .22 refers to a caliber of the ammunition, which is based on the diameter of the bullet. Within a given caliber, there are "specific calibers," such as .22–short, .22–long, and .22–long rifle. The .22–long rifle round is not exclusive to rifles; it is a very typical handgun round.

Yoshida examined the five .22–cartridge cases that were found at the crime scene. All five were .22–long rifle, and displayed a "U" head stamp, which was placed there by the manufacturer. Yoshida examined the cartridge cases under a low-powered microscope and noted that the firing pin impressions on all five were the same shape and had similar details, which gave her the impression that all five could have been fired from the same gun. She next performed "a comparison microscope examination," which allowed her to view two cases simultaneously. She found "some correspondence" with the extractor marks but not enough to for her to decide "one way or the other regarding what their association was." She then looked at the chamber marks and concluded that "[t]here was sufficient correspondence between the group of them" to determine that all five had been fired by the same firearm. She explained that chamber marks are created while the cartridge is sitting inside the chamber. "When the powder goes off ... it's very hot and it causes the cartridge to expand. So it's pressing against the walls of the chambers and it's being pulled out. [¶] So what you get is marks that are length-wise with the cartridge ...." When examining the chamber marks, Yoshida looks at "striations," which, because of the tooling, are random. She looks "to see where they correspond to one another, that they're the same; the same place, the same location on the cartridge case, and ... for ones that correspond in a row, like three or four that match in a row or more."

Yoshida examined two .22–caliber, long-rifle cartridge cases recovered near the diverting canal off of Main Street in Stockton where Bennett testified defendant had fired the handgun.[FN. 4 omitted.] Both had the "U" head stamp, similar firing pin impressions, and details that were consistent with the cases collected from the crime scene. Yoshida concluded that the two cases collected from the diverting canal were fired from the same gun as the cases collected from the crime scene.

Yoshida examined defendant's handgun, which she described generally as a "J–22 firearm" and more specifically as a ".22 caliber long rifle pistol, handgun." She test fired the gun nine times into a large box filled with water, collected the bullets and cartridge cases, and compared them to each other to determine "how reproducible the marks are because I'm going to need to know that to be able to evaluate any further additional evidence ...." She explained that "they're never, ever going to be exactly the same marks every single time" and that "there are some firearms [that] are just not

7

reproducible at all ....” Assuming the marks are reproducible, comparing the bullets and cases from the test fires also assists in determining “the amount of agreement between things, if there is agreement, what the amount is, if there's a whole lot or not very much.” Yoshida determined that “there was sufficient agreement between the chamber marks and the extractor marks, that they were fired from the same firearm,” and thus, determined the marks were reproducible. She then compared the cartridge cases from the test fires to those collected at the crime scene and the diverting canal and concluded that “in all practical certainty” they were all fired from defendant's gun.

[FN. 5: Yoshida also compared the four bullets that were found in or underneath Dalene’s remains with those that were test fired and found that while they had similar rifling characteristics, there was insufficient “other detail” for her to find that they were fired from the same gun.]

On cross-examination, Yoshida explained that the phrase “all practical certainty” is equivalent to a feature “that is absolutely unique to one particular firearm.” “It's like DNA. They have numbers. You can't match to one. They'll never say it is that person. It's always there's a one and 20 quad zillion chance it is. So practical certainty is what we call it.”

Jim Cook testified as a “[w]ireless expert in the area of cellular phones.” Cook reviewed the cellular records for defendant's and Dalene's cellular phones from the night of August 6 through midday on August 7, 2011. Among other things, Cook testified that the phone activity from Dalene's phone from 1:42 a.m. through 4:42 a.m. on August 7, 2011, was handled by the Claremont Avenue cellular tower which serviced defendant's home address. There was no call activity on Dalene's phone between 5:25 a.m. and 9:57 a.m. that could be mapped. At 9:57 a.m., Dalene's phone activity was serviced by a cellular tower in the Jack Tone Road area near Manteca. There was no activity on Dalene's phone from 9:57 a.m. to 11:03 a.m. At 11:03 a.m., phone activity from Dalene's phone was serviced by the 2303 West Lane tower in Stockton. The 11:25 a.m. text from Dalene's phone that stated “im walking home” was handled by the Claremont Avenue cellular tower that serviced defendant's residence and was not consistent with cellular services that would have taken place on Country Club Boulevard.

As for defendant's phone, Cook testified that at 6:04 a.m., 6:05 a.m., and 6:08 a.m. on August 7, 2011, defendant's phone connected with the cellular site located on North Walnut Avenue in Manteca. His phone made no connections from 6:13 a.m. to 9:57 a.m, indicating that it was either turned off or the battery had died. At 9:57 a.m., defendant's phone connected to a cellular site that serviced his residence. There was no indication defendant texted or called Dalene after 1:19 a.m. on August 7, 2011.

(People v. Gilley, slip op. at *1-6.)

//

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

1  correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it

2  cannot be said that there is "clearly established Federal law" governing that issue.  Carey v.

3  Musladin, 549 U.S. 70, 77 (2006).

4        A state court decision is "contrary to" clearly established federal law if it applies a rule

5  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

6  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

7  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

8  writ if the state court identifies the correct governing legal principle from the Supreme Court's

9  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3]  Lockyer v.

10 Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

11 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

12 because that court concludes in its independent judgment that the relevant state-court decision

13 applied clearly established federal law erroneously or incorrectly.  Rather, that application must

14 also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550

15 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

16 'independent review of the legal question,' is left with a "'firm conviction'" that the state court

17 was "'erroneous'"").  "A state court's determination that a claim lacks merit precludes federal

18 habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

19 decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

20 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

21 court, a state prisoner must show that the state court's ruling on the claim being presented in

22 federal court was so lacking in justification that there was an error well understood and

23 comprehended in existing law beyond any possibility for fair-minded disagreement."  Richter,

24 562 U.S. at 103.

25 //

26 _____

27 [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
   overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
   presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
28 384 F.3d 628, 638 (9th Cir. 2004)).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

11

1    reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

2    reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

3         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

4    Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

5    just what the state court did when it issued a summary denial, the federal court must review the

6    state court record to determine whether there was any "reasonable basis for the state court to deny

7    relief." Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

8    have supported the state court's decision; and then it must ask whether it is possible fairminded

9    jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

10   decision of [the Supreme] Court." Id. at 101.  The petitioner bears "the burden to demonstrate

11   that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

12   925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

13        When it is clear, however, that a state court has not reached the merits of a petitioner's

14   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

16   F.3d 1099, 1109 (9th Cir. 2006).

17   V.  Petitioner's Claims

18        A.  *Petitioner's Statements to Detectives Burrell & Knief*

19        In ground one of his petition, petitioner claims that his constitutional due process rights

20   were violated when the police overbore his will by making implied promises by telling him he

21   had an "opportunity" to "help himself," and by impliedly threatening his family.  (ECF No. 1 at 5,

22   9-19; ECF No. 26 at 6-17; ECF No. 30 at 7-21.)  Respondent maintains the state court's rejection

23   of petitioner's claim was reasonable, foreclosing the relief requested.  (ECF No. 29 at 17-24.)

24        The last reasoned rejection of petitioner's first claim is the decision of the California

25   Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

26   addressed this claim as follows:

27   //

28   //

*Statements Made by Defendant During the August 14, 2011,*
*Interview Were Properly Admitted*

Defendant first contends that "[t]he trial court violated [his] fourteenth amendment right to due process when it admitted into evidence his involuntary pretrial recorded statements ... made to Detectives Bradley Burrell and James Knief." We disagree.

Following his arrest on August 14, 2011, defendant was interviewed by Detectives Burrell and Knief. When asked about the night in question, defendant initially repeated the story he told to Detectives Lane and Knief several days earlier, namely that he left the bar alone after receiving a text from his grandmother telling him that his son was sick. Eventually, the detectives confronted defendant with "inconsistencies" in his story. They told him that he was in a "good position to help" himself, and that they did not want him to "waste this opportunity." They explained that it was okay if he could not recall "every minute" because such details could be gleaned from video surveillance, cell phone records, and receipts and advised him that "we know a lot of information." The detectives also stated that "sometimes things happen" and that "there's accidents." The detectives then told defendant, "[L]et's start over."

Defendant again stated that he left the bar about 1:00 a.m. and went home to check on his son after receiving a text from his grandmother. At that point, the detectives advised defendant that they had spoken to his grandmother and that she denied texting him on the night in question. Defendant then admitted that his grandmother had not contacted him and said that he had gone home on his own to be with his son. When asked who he left with, defendant again insisted that he left by himself and went home. Burrell asked, "Didn't make any stops, you stopped nowhere?" At that point, defendant admitted leaving the bar with Dalene, driving to Food–4–Less, and buying her a bottle of Jägermeister, but said that he took her back to the bar before going home. When the detectives asked defendant why he would lie about such an important fact as having left with Dalene, he said that it slipped his mind.

The detectives told defendant that "[t]here's a whole lot more to this story," explained that they already knew the answers to the questions they had asked him, and urged him to think about his son. They said, "[W]e can make this work, we can make this okay, but you gotta be honest. Starting right now. Starting right now. Okay? Because otherwise this, your making decisions that will affect you forever." The detectives then asked defendant what else had slipped his mind, and defendant acknowledged texting Dalene and asking her for pictures. The detectives then explained that "we have a lot of resources" and "don't ask questions we don't know the answer to,"

13

and asked defendant, "[W]hat else do you want to change about your story? Help us help you, okay?" At that point, defendant admitted inviting Dalene to come back to his house and crash on the couch, but said he later changed his mind and took her back to the bar after buying her a bottle of alcohol at Food–4–Less. When asked why he lied about inviting Dalene back to his house, defendant said he was scared because he knew Dalene disappeared around the same time.

Shortly thereafter, the detectives advised defendant that they had reviewed hours of video surveillance from the bar and none of it showed him dropping Dalene off there. They told him that he needed to worry about his son and mother, who was "stressed out big time." Burrell then asked defendant a series of questions, "I assume you care about your son, right? You want to have him in your life, you want to be in his life, right? Jason, this is all bad dude, okay? And this was not something that was planned, okay? I know that, okay?" Burrell then urged defendant to "tell us about where you and Dalene went after Food 4 Less ... because it wasn't to the bar ...." Defendant responded, "I'm really scared cuz I know when people are missing it looks like you guys are looking at me the last person that they were last with usually does something." Burrell replied, "Ok then be honest and stop lying." At that point, defendant admitted that he and Dalene had gone back to his house. He told the detectives, "We went back to my house, we drank a little bit and then she called and she started to walk off to go home. ... I wasn't gonna let her walk all the way home, she had been drinking a lot um, so I got my grandmother's car and I got her at the corner of my house .... I know that it was off Charter Way so I was driving down, I believe, California Street or somewhere, and right before I got to Charter she jumped out of the car at the stoplight she got out." After discussing the route defendant took and where exactly Dalene had gotten out of the car, Burrell asked defendant, "So she jumped out of the car and you just left her?" Defendant responded, "... I didn't know what else to do, she was starting to be irate." Burrell told defendant that "there's still more to this" and that he needed to realize that "we have all sorts of crazy ways of getting phone records and this and that and the other, okay?" The detectives then implored defendant to "make it better" and "do the right thing." The discussion then turned to what was said when defendant and Dalene left defendant's house. Defendant said Dalene just wanted to go home, and he said he would take her home. The following exchange then ensued:

"Knief: Did you have sex?

"[Defendant]: No

"Knief: Jason

14

"Burrell: Jason

"Knief: Jason

"[Defendant]: Yes."

At the preliminary hearing, defendant moved to exclude his statements during the August 14, 2011, interview on the ground that the statements were not voluntary. The trial court denied the motion "at this point," noting that after reviewing the "testimony presented," it did not find "any offers of leniency, promises or reward, threats, any physical or psychological coercion that would rise to the level of making this statement involuntary." Defendant renewed his request in a motion in limine. The trial court denied the motion. After watching the DVD of the interview and reviewing the transcript of the same, the trial court found that the People had established by a preponderance of the evidence that defendant's statements were voluntary under the totality of the circumstances.

"An involuntary confession may not be introduced into evidence at trial," and "[t]he prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made." (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) """When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness." [Citation.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346 (*McWhorter*).)

"In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576.) """In determining whether or not an accused's will was overborne, 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." [Citation.]' [Citation.]""" (*McWhorter, supra*, 47 Cal.4th at p. 347.)

"'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. ... Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]'" (*People v. Holloway* (2004) 33

Cal.4th 96, 115 (*Holloway*).)

"'Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*McWhorter, supra*, 47 Cal.4th at p. 347.) A statement is involuntary "only if the threat [or promise] actually induces defendant to make the statement. [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 442 (*Lucas*).)

These same rules apply to all incriminating statements whether they be confessions in the strict sense or only admissions. (*People v. Brommel* (1961) 56 Cal.2d 629, 632 (*Brommel*), overruled on another ground by *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17.)

Defendant contends that "[c]onsidering the totality of the circumstances ..., his statements to the detectives, in which he changed his version of events on at least two occasions, were involuntary and should have been excluded." More particularly, defendant argues that by repeatedly using the word "opportunity" and the phrase "help yourself," and by telling defendant "we can make this work, we can make this okay, but you gotta be honest," the detectives implied that if defendant "told the detectives what they wanted to hear and changed his story to one that was more to their liking he would end up in a better position penologically."

The statements cited by defendant constituted general advice to tell the truth and fall far short of an implied promise of leniency in exchange for defendant changing his story. As set forth above, merely advising a suspect that it would be better to tell the truth, unaccompanied by either a threat or a promise, does not render a confession involuntary. (*Holloway, supra*, 33 Cal.4th at p. 115.) Defendant's assertion that "the idea that confessing to Dalene's murder presented an 'opportunity' was patently false" because "murder carries a fixed indeterminate term" ignores that the benefits of being truthful and honest extend beyond the length of the prison term imposed, and include things such as unburdening oneself. Indeed, comments that a defendant would feel better or would help himself by cooperating do not, by themselves, constitute improper inducements. (*People v. Hill* (1967) 66 Cal.2d 536, 549.) Moreover, "[n]o constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (*Carrington, supra*, 47 Cal.4th at p. 174.) This is effectively what the detectives did here by urging defendant to tell the truth while confronting him with "inconsistencies" in his story.

Defendant's reliance on *Brommel, supra*, 56 Cal.2d at page 632 and *People v. McClary* (1977) 20 Cal.3d 218, overruled on another ground in *People v. Cahill, supra*, 5 Cal.4th at pages 509–510, footnote 17, is misplaced. In *Brommel*, the defendant was arrested on suspicion of murdering his infant daughter. (*Brommel*, at p. 631.) After he denied the accusations against him, a police officer told him that the officer would write the word "'[l]iar'" on the police report if he did not change his story, and the judge would then not believe him because he will have been "'branded as a liar.'" (*Id*. at p. 633.) The defendant subsequently confessed. (*Id*. at p. 634.) Our Supreme Court held that the confession was inadmissible because the officer's statement was both a threat and an implied promise of leniency. (*Id*. at pp. 633–634.) In *McClary*, the police interrogated the 16–year-old defendant about her involvement in a murder. (*McClary*, at p. 222.) After she denied any involvement, the police made statements that implied that the she would be charged as a principal to murder and would face the death penalty if she refused to admit her true involvement in the murder. (*Id*. at pp. 223–224.) Our Supreme Court held that the defendant's subsequent confession was "involuntary, a product of improper police threats and inducements ...." (*Id*. at p. 227.) In addition to making a direct and "partially false" threat, the interrogating officers "strongly implied that if defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact." (*Id*. at p. 229.)

Unlike *Brommel*, the detectives' conduct in this case did not rise to the level of a threat or implied promise of leniency. To the contrary, the detectives in this case made it clear that they were only asking for the truth and never threatened to brand defendant a liar, much less communicate any information to the judge if defendant did not change his story. Unlike *McClary*, defendant was not warned that he may face the death penalty unless he acknowledged his involvement in the murder. Punishment was never discussed.

Defendant also contends that his statements were coerced by the detectives' exploitation of his love for his family. As defendant correctly notes, courts have condemned interrogations in which the police exploited a defendant's fear of losing his family to coerce a confession. (See *Lynumn v. Illinois* (1963) 372 U.S. 528 [9 L.Ed.2d 922] (*Lynumn*); *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332 (*Tingle*).) That was not the case here. At several points during the interview, the detectives urged defendant to think about his son and mother and said that his mother was "worried sick." They also asked defendant, "I assume you care about your son, right?" and "You want to have him in your life, you want to be in his life, right?" Defendant was never told that would not be able to see his son or any other family member if he did not cooperate. Rather, the detectives invoked defendant's family members in an effort to get defendant to

tell the truth. The detectives' rhetorical question, "You want to have [your son] in your life, you want to be in his life, right," was followed by a statement urging defendant to "tell us about where you and Dalene went after Food 4 Less ... because it wasn't to the bar ...." It was only after defendant explained that he was scared because he knew that when people are missing, the person "they were last with usually does something," and Detective Burrell responded, "Ok, then be honest and stop lying," that defendant admitted taking Dalene back to his house.

*Lynumn* and *Tingle*, cited by defendant, are distinguishable. In *Lynumn*, the United States Supreme Court found coercive a police officer's warnings to a defendant that if she did not cooperate, her government aid would be cut off and her children would be taken away. (*Lynumn, supra*, 372 U.S. at pp. 530–534.) In *Tingle*, the Ninth Circuit found the following warnings by an FBI agent to a bank robbery suspect "that a lengthy prison term could be imposed, that [she] had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while" were "patently coercive" when read together. (*Tingle, supra*, 658 F.2d at p. 1336, fns. omitted.) The court found that the objective of the interrogation was "to cause [the defendant] to fear that, if she failed to cooperate, she would not see her young child for a long time." (*Ibid*.)

Unlike *Lynumn*, defendant was never directly threatened with the loss of his son. That fact alone distinguishes the present situation. Unlike *Tingle*, defendant was never told that his cooperation or lack thereof would be communicated to the prosecutor, the judge, or anyone else. Potential punishment was never discussed. And defendant was never told that he would not or might not see his son for a while unless he cooperated.

To the extent defendant complains that the detectives' statements that "sometimes things happen" and "that's okay, there's accidents" were improper, he is mistaken. Such statements are permissible tactics, not coercive. (*Carrington, supra*, 47 Cal.4th at p. 171.)

Furthermore, assuming for argument's sake that the detectives' remarks could be construed as coercive, we would still find defendant's statements were voluntary. Having watched the DVD of the interview and reviewed the transcript of the same, it is clear to us that defendant's admissions were not induced by the challenged remarks, but rather were made in response to the detectives representation that they had could easily obtain evidence contradicting defendant's original version of events. Accordingly, the requisite nexus between the detectives' challenged statements and

18

defendant's admissions is missing. (*McWhorter, supra*, 47 Cal.4th at p. 347; *Lucas, supra*, 12 Cal.4th at p. 442.) Defendant admitted that his grandmother did not text him after the detectives advised him that they had spoken to his grandmother who denied texting him on the night in question. Defendant admitted leaving the bar with Dalene after Burrell rhetorically asked, "Didn't make any stops, you stopped nowhere," implying that he knew otherwise. Defendant admitted taking Dalene back to his house after the detectives informed him that they had reviewed surveillance video from Finnegan's Bar and knew he did not take Dalene back there. Defendant admitted having sex with Dalene after Burrell told him that "there's still more to this" and "we have all sorts of crazy ways of getting phone records and this and that and the other," and both detectives were openly skeptical when he denied having sex with Dalene.

For all the foregoing reasons, we find that defendant's statements during the August 14, 2011, interview were voluntary.

(People v. Gilley, slip op. at *6-10.)

Applicable Legal Standards

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. Blackburn v. Alabama, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999). But absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

In determining the voluntariness of a confession, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434 (2000). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Culombe v. Connecticut, 367 U.S. 568, 602 (1961).

The reviewing court looks at "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). Certainly, the court should take into account a multitude of factors as

19

1   part of its evaluation.  See, e.g., Withrow v. Williams, 507 U.S. 680, 693 (1993) (potential

2   circumstances to consider include police coercion; the length, location, and continuity of the

3   interrogation; the defendant's maturity, education, physical condition, and mental health; and the

4   failure of police to advise the defendant of his rights to remain silent and to have counsel present

5   during custodial interrogation); Schneckloth, 412 U.S. at 226 (the court must examine "the factual

6   circumstances surrounding the confession, assess[ ] the psychological impact on the accused, and

7   evaluate [ ] the legal significance of how the accused reacted").  The Supreme Court has observed

8   that "[t]he application of these principles involves close scrutiny of the facts of individual cases."

9   Gallegos v. Colorado, 370 U.S. 49, 52 (1962).

10         Law enforcement officials cannot extract a confession "by any sort of threats or violence,

11   or ... by any direct or implied promises, however slight, or by the exertion of any improper

12   influence."  Hutto v. Ross, 429 U.S. 28, 30 (1976).  False promises or threats may render a

13   confession invalid.  See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (confession found to

14   be coerced when police officers told defendant that state financial aid for her infant children

15   would be cut off, and her children taken from her, if she did not cooperate); Spano v. New York,

16   360 U.S. 315, 323 (1959) (confession found to be coerced when police officers instructed

17   defendant's childhood friend to falsely state the defendant's telephone call had gotten him into

18   trouble, that his job was in jeopardy, and that loss of his job would be disastrous to his three

19   children, his wife, and his unborn child).

20         The Supreme Court has required a high level of coercion to render a confession

21   involuntary. See e.g., Mincey v. Arizona, 437 U.S. 385, 398-402 (1978) (finding a confession to

22   be involuntary where defendant, while hospitalized and sedated in intensive care, was

23   interrogated for four hours); Greenwald v. Wisconsin, 390 U.S. 519, 520-521 (1968) (finding a

24   confession to be involuntary where a medicated defendant was questioned for over eighteen hours

25   and was deprived of food and sleep); Beecher v. Alabama, 389 U.S. 35, 36-38 (1967) (finding a

26   confession to be involuntary where police officers held a gun to defendant's head).

27         Additionally, "misrepresentations made by law enforcement in obtaining a statement,

28   while reprehensible, do[ ] not necessarily constitute coercive conduct."  Pollard v. Galaza, 290

20

1   F.3d 1030, 1034 (9th Cir. 2002); see also Frazier v. Cupp, 394 U.S. 731, 737-39 (1969)

2   (confession found to be voluntary despite an officer's false statement that a coconspirator had

3   confessed).  Likewise, encouraging a suspect to tell the truth is not coercion.  Amaya–Ruiz v.

4   Stewart, 121 F.3d 486, 495 (9th Cir. 1997), overruled on other grounds by United States v.

5   Preston, 751 F.3d 1008 (9th Cir. 2014) (en banc).

6       The question in cases involving psychological coercion "is whether[, in light of the

7   totality of the circumstances,] the defendant's will was overborne when the defendant confessed."

8   United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993).  More specifically, courts consider

9   the following factors: the age of the accused, his intelligence, the lack of any advice to the

10  accused of his constitutional rights, the length of detention, the repeated and prolonged nature of

11  the questioning, and the use of physical punishment such as the deprivation of food or sleep.

12  United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).

13      Analysis

14      The undersigned has carefully reviewed the state appellate court's decision and the record

15  before the state appellate courts in this matter, including the transcript of the interview in

16  question.  (ECF No. 30-4 at 98-163; ECF No. 30-17.)

17      First, the state appellate court's determination that petitioner's statements were voluntary

18  and not the product of unconstitutional coercion is not objectively unreasonable nor was it

19  contrary to Supreme Court precedent.  28 U.S.C. § 2254(d).  The record reveals the interview at

20  issue began with the detectives asking petitioner generally about his interactions with the victim

21  and his whereabouts during the relevant time period, following up petitioner's various responses

22  with additional questions.  (ECF No. 30-4 at 98-134.)  Eventually, the detectives advised

23  petitioner that his story contained a number of inconsistencies.  (ECF No. 30-4 at 134.)  It is at

24  that point the detectives' various references to an "opportunity" available to petitioner to "help"

25  himself by being honest begin.  (See ECF No. 30-4 at 134-35, 137, 139-40, 145-46, 148, 155-56,

26  158, 161-62.)  But a review of the detectives' comments in context reveals the state court's

27  adjudication was not "so lacking in justification that there was an error well understood and

28  comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 562

U.S. at 103.  That conclusion is so because the comments can reasonably be said to amount to advice to tell the truth in a general sense, rather than as implied promises of leniency should petitioner change his story to comport with the detectives' narrative.  Hutto v. Ross, 429 U.S. at 30.  At bottom, fairminded jurists could disagree on the correctness of the decision.  Richter, 562 U.S. at 101.

Second, the state appellate court's determination that no coercion occurred by way of exploitation of petitioner's family's love by the detectives is neither objectively reasonable nor contrary to Supreme Court precedent.  28 U.S.C. § 2254(d).  The record reveals the detectives referenced petitioner's young son, mother and grandmother during the interview, noting their love and worry, including petitioner's son's desire to spend time with him and experience petitioner's affection.  (See ECF No. 30-4 at 138, 140, 143, 161-62.)  The detectives' references to petitioner's family during the interview do not compare to those at play in Lynumn and Tingle. In Lynumn, the officers specifically threatened financial aid would be cut off to the suspect's children and that she would not see them again unless she cooperated; the suspect had no reason not to believe the officers.  Further, that questioning occurred while the suspect was encircled by three police officers and a felon who arranged the purported drug buy.  Lynumn, 372 U.S. at 534. In Tingle, officers recited maximum penalties for the crimes being faced by the suspect, totaling forty years, and then told her she would not see her two-year-old child "for a while."  The officers suggested it would be in the suspect's best interests to cooperate and that her cooperation would be communicated to the prosecutor.  This interrogation occurred while the suspect was sitting in a police car with two officers and resulted in the suspect sobbing and shaking.  Tingle, 658 F.2d at 1333-34, 1336.  Fairminded jurists could disagree on the correctness of the decision.  Richter, 562 U.S. at 101.

Here, a review of the detectives' comments in context reveals the state court's adjudication was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 562 U.S. at 103.  That is so because the references to petitioner's son, mother and grandmother, and their love and worry, were not accompanied by any threat to petitioner that he would lose his son,

22

1    nor was punishment discussed, nor petitioner's ability to see his family conditioned upon his

2    cooperation.  It can reasonably be said the detectives employed permissible tactics during the

3    interview in question.  Richter, 562 U.S. at 103.

4          In reviewing the voluntariness of petitioner's statements, this record reveals the

5    detectives' conduct can reasonably be considered sound and not coercive.  Miller v. Fenton, 474

6    U.S. at 116; Colorado v. Connelly, 479 U.S. at 167.  The interview was not unreasonably lengthy

7    nor did the location work a coercive effect on petitioner.  Petitioner was about 25 or 26 years old

8    at the time of the interview and apparently of average education.  (ECF No. 30-1 at 71 [DOB:

9    10/15/1985].)  Petitioner's physical condition and mental health did not factor against a finding of

10    voluntariness.  Withrow v. Williams, 507 U.S. at 693.  There was no high level of coercion here.

11    Mincey v. Arizona, 437 U.S. at 398-402; Greenwald v. Wisconsin, 390 U.S. at 520-521; Beecher

12    v. Alabama, 389 U.S. at 36-38.  It can reasonably be said that petitioner's will was not overborne

13    by the circumstances.  Dickerson v. United States, 530 U.S. at 434.

14          In sum, the state court's decision that petitioner's statements were voluntary was not

15    contrary to, or an unreasonable application of, clearly established Supreme Court authority.  28

16    U.S.C. § 2254(d).  Therefore, the undersigned recommends the claim alleged in ground one of the

17    habeas petition be denied.

18          B. *Petitioner's Fetish for Women's Underwear*

19          In ground two, petitioner claims that his constitutional rights to due process and a fair trial

20    were violated when the trial court permitted the introduction of evidence of petitioner's fetish for

21    women's underwear.  (ECF No. 1 at 5, 20-23; ECF No. 26 at 18-20; ECF No. 31 at 21-23.)

22    Respondent contends the state court's decision was reasonable and that petitioner's claim must be

23    denied.  (ECF No. 29 at 25-27.)

24          The last reasoned rejection of petitioner's claim is the decision of the California Court of

25    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

26    this claim as follows:

27    ////

28    ////

*Any Error in Admitting Defendant's Statement That He Had a*
*Fetish for Women's Underwear Was Harmless*

Defendant next contends that the trial court abused its discretion in denying his motion to exclude his statement that he had a "fetish" for women's underwear because such evidence was not relevant to any disputed issue of fact and was highly prejudicial. We need not decide whether the trial court abused its discretion in admitting this evidence because any error was harmless.

Over defendant's objection, a portion of defendant's August 14, 2011, interview with the detectives was played for the jury in which the detectives brought up the fact that two pairs of women's underwear were found in defendant's bedroom. Defendant explained that one pair belonged to a woman named Christine, and the other belonged to a woman named Sarah. Later, the detectives questioned defendant about text messages sent from his phone to Dalene's several days before she went missing, in which defendant asked her to send him photographs of herself. Defendant told the detectives, "One I wanted for the context and the other one I was just being stupid and you guys found the underwear and *I kinda have a fetish for that*." (Italics added.)

After the DVD of the August 14, 2011, interview had been played for the jury, which included defendant's statement that he had a fetish for women's underwear, defendant moved for a mistrial on the ground that the trial court's pretrial ruling was based on the prosecutor's representation that there was evidence defendant alerted detectives to the presence of Dalene's underwear in his room, and no such evidence had been produced. The trial court denied the motion for a mistrial, noting that it would "stick with [its] original ruling ...."

Even assuming for argument's sake that the trial court erred in admitting evidence defendant had a fetish for women's underwear, reversal is not required unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded. (See *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018–1019.)

[FN. 6: To the extent defendant contends the error was one of constitutional dimension, we disagree. Even if evidence should have been excluded under state law, its admission results in a due process violation only if it makes the trial fundamentally unfair. (*People v. Merriman* (2014) 60 Cal.4th 1, 70.) "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) For the reasons stated below, evidence

24

defendant had a fetish for women's underwear was not of such quality that it necessarily prevented a fair trial.]

Defendant's statement that he had a fetish for women's underwear was brief and part of a lengthy interview. The detectives conducting the interview did not follow up on it, and neither the prosecutor nor defendant's trial counsel mentioned the statement in their closing arguments. While the evidence was somewhat inflammatory, it was no more inflammatory than evidence defendant had two pairs of underwear belonging to two different women in his bedroom and had texted Dalene several days before she disappeared requesting photographs of her in her underwear. Finally, the evidence defendant murdered Dalene was strong. Surveillance video showed the two together outside a Food–4–Less early in the morning on the day Dalene went missing. Dalene told Jacob and James that she was going to defendant's house after leaving the bar to drink. Defendant admitted taking Dalene to his home and having sex with her that morning and said that after they had sex, she became upset and wanted to leave. According to defendant, Dalene called him "horrible" and "a piece of garbage" and said that she could not believe that he did "this." The ballistics expert concluded that "in all practical certainty" the cartridge cases found at the crime scene were fired from defendant's gun.

Defendant claims that the ballistics evidence was "equivocal" because "there is no singular, iron clad mark definitively showing that a particular casing was fired from a specific gun," and he established, through cross-examination, that the tools and grooves method of identification used by Yoshida had been criticized by the National Academy of Science. We are not persuaded. The absence of a "singular, iron clad mark definitively showing that a particular casing was fired from a specific gun" does not make the ballistics testimony equivocal. Yoshida testified that there will "never, ever ... be exactly the same marks every single time" a firearm is discharged. She also explained that she takes a variety of marks into account in forming an opinion, most notably the firing pin, extractor, and chamber marks. Here, she found that the firing pin impressions on the cartridge cases from the test fires and those collected at the crime scene "matched very well," but acknowledged that "this is the type of tooling mark that could be reproduced," and thus the mark was not unique. She also found that "[t]here was sufficient correspondence [among the extractor marks] to say that it was the same tool," but explained that "you can ... get an extractor mark without actually firing the gun" by loading the magazine, pulling the slide back, and having the intact cartridge being thrown out. After comparing the chamber marks, she concluded "[t]hat in all practical certainty" the cartridge cases found at the crime scene were fired from defendant's gun.

The criticisms raised by defendant's trial counsel during his cross-examination of Yoshida likewise did not render the ballistics evidence equivocal. During cross-examination, Yoshida was asked about a 2009 report published by the National Academy of Science that purportedly criticized tool mark and firearm examiners for not keeping "any sort of statistical error rates." Yoshida explained that "[t]here are error rates out there that have been published" and noted that each year her lab in Ripon participates in "proficiencies," whereby an outside vendor provides the lab with bullets and cartridge cases to examine and compare. According to Yoshida, "There's a right and wrong answer. And those answers are submitted back to the company" and published, and "people use that data in an attempt to determine error rates." Yoshida was also asked about the criticism that "there really isn't enough research done among individual guns to know, for example, variabilities of individual guns." Yoshida responded that there had been numerous studies examining instances where tools were manufactured one after the other and "people have still been able to identify cartridge casings and bullets from different guns, even though they're manufactured one after the other ...."

Having reviewed the entire record in this case, we reject defendant's assertion that the ballistics evidence was equivocal and find that there is no reasonable probability that defendant would have obtained a more favorable result had the jury not learned of his statement that he had a fetish for women's underwear.

(People v. Gilley, slip op. at *10-11.)

Applicable Legal Standards

A state court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation a petitioner's due process rights. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." Id.

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," Dowling v. United States, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). It has opted not to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75 & n.5 (noting that the Court "express[ed] no opinion on whether a

1  state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence

2  to show propensity to commit a charged crime").  Moreover, the Supreme Court "has not yet

3  made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

4  process violation sufficient to warrant issuance of the writ."  Holley, 568 F.3d at 1101 (citing

5  Carey v. Musladin, 549 U.S. at 77).  In the absence of clearly established law that admission of

6  even overtly prejudicial evidence constitutes a due process violation, the court cannot conclude

7  that the state court's ruling was an "unreasonable application."  Id.  A federal court is "without

8  power" to grant a habeas petition based solely on the admission of evidence.  Id.

9       Even setting aside the issue of clearly established federal law, "[a] habeas petitioner bears

10  a heavy burden in showing a due process violation based on an evidentiary decision."  Boyde v.

11  Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended, 421 F.3d 1154 (9th Cir. 2005).  Again,

12  "'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial

13  fundamentally unfair in violation of due process.'"  Holley, 568 F.3d at 1101.  "Only if there are

14  no permissible inferences the jury may draw from evidence can its admission violate due

15  process."  Alcala v. Woodford, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original); Houston

16  v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999).  "Even then, the evidence must 'be of such quality

17  as necessarily prevents a fair trial.'"  Jammal v. Van de Kamp, 926 F.2d at 920 (citation omitted).

18  That can only occur if the admission of the evidence had a "'substantial and injurious effect or

19  influence in determining the jury's verdict.'"  Brecht, 507 U.S. 619, 623 (1993) (quoting

20  Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

21       Analysis

22       The undersigned has carefully reviewed the record regarding the admission of the

23  evidence at issue.  (See ECF No. 30-3 at 15-16; ECF No. 30-4 at 98-164; ECF No. 30-8 at 126-

24  128, 142-45, 155-57; ECF No. 30-12 at 37-40, 59, 62-63, 73-85, 90-94.)

25       Background

26       The defense sought to exclude petitioner's reference to his fetish for women's underwear

27  pursuant to California Evidence Code section 352.  (ECF No. 30-8 at 143.)  The court considered

28  the parties' arguments and reviewed the transcript of the interview again specifically pertaining to

1   the issue (ECF No. 30-8 at 142-45) before denying the motion to exclude the evidence, finding it

2   more probative than prejudicial (ECF No. 30-8 at 155-57).

3          During trial, an officer testified that during the search of petitioner's home, he recorded

4   the evidence collected, including two pairs of women's underwear:  one white thong and a pair of

5   black and red panties.  (ECF No. 30-8 at 242.)  During Detective Burrell's direct examination in

6   the prosecution's case, the August 14, 2011, videotaped interview with petitioner was played for

7   the jury.  (ECF No. 30-9 at 260-74; see also ECF No. 30-4 at 98-164 [transcript of same

8   interview].)  Defense counsel later moved for mistrial on the basis that the prosecutor's previous

9   indication that petitioner's statement about having a fetish for women's underwear would be

10  admitted into evidence was inaccurate because "no statement like that whatsoever came in."

11  (ECF No. 30-12 at 37-38.)  After hearing argument from the parties, the court delayed ruling on

12  the motion to allow for a review of the previous ruling.  (ECF No. 30-12 at 38-39.)  Thereafter,

13  the defense called Detective Burrell to the stand.  (ECF No. 30-12 at 59.)  The detective

14  confirmed he was aware that two pair of women's underwear were seized during the search of the

15  home petitioner shared with his family, and that the detective delivered the evidence to the

16  Department of Justice (DOJ) laboratory.  (ECF No. 30-12 at 62-63.)  Detective Burrell testified

17  that petitioner had advised during an interview that the underwear belonged to a woman named

18  "Sarah" and a woman named "Christy in New York."  (ECF No. 30-12 at 63.)  Next, Sheltri

19  Gresham, a DNA analyst at the DOJ lab testified on direct examination for the defense that the

20  underwear were tested; petitioner, the victim, and others were excluded as DNA contributors as to

21  both pair.  (ECF No. 30-12 at 73-85.)

22         Later, once again outside the jury's presence, the court heard from the parties further and

23  denied the defense motion for mistrial, referencing its earlier ruling on the issue pursuant to "the

24  352 analysis."  (ECF No. 30-12 at 90-94.)

25                         *Discussion & Finding*

26         Because United States Supreme Court precedent does not clearly establish that the

27  admission of this type of evidence violates due process, petitioner is not entitled to relief in these

28  proceedings.  See Holley, 568 F.3d at 1101 (a federal habeas court constrained by the AEDPA

1  would have no power to grant habeas relief for a claim premised on the erroneous admission of

2  evidence because the United State Supreme Court "has not yet made a clear ruling that admission

3  of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

4  warrant issuance of the writ"); see also Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no

5  Supreme Court precedent creates clearly established federal law relating to the legal issue the

6  habeas petitioner raised in state court, the state court's decision cannot be contrary to or an

7  unreasonable application of clearly established federal law").  .

8      Nevertheless, the state court reasonably concluded the trial court's determination to admit

9  evidence related to petitioner's statement regarding a fetish for women's underwear, even

10  assuming it was admitted in error, was harmless.  That is so because the evidence did not have a

11  "substantial and injurious effect on the jury's verdict."  See Plascencia v. Alameida, 467 F.3d

12  1190, 1203 (9th Cir. 2006) (applying Brecht harmless error analysis to claim that admission of

13  evidence was improper).  The reference to petitioner's statement about a fetish for women's

14  underwear during trial testimony was brief: petitioner's August 14, 2011, videotaped interview

15  with detectives was played for the jury.  (ECF No. 30-4 at 139 ["and you guys found the

16  underwear and I kinda have a fetish for that"]; ECF No. 30-9 at 260-74.)  Other trial testimony

17  referenced panties or women's underwear, but not petitioner's admission of a fetish for women's

18  underwear.  (See, e.g., ECF No. 30-8 at 242; ECF No. 30-10 at 15; ECF No. 30-12 at 62-63

19  [defense direct examination of Detective Burrell] & 73-85 [defense direct examination of DNA

20  Analyst Gresham].)  Petitioner's statement about a fetish for women's underwear was not

21  referenced by the prosecutor in his closing argument to the jury  (ECF No. 30-12 at 174-265.)

22  There were a few references to the word "panties" (ECF No. 30-12 at 204-08, 217, 230, 253-54),

23  but none to the word "fetish."  In rebuttal, neither the word "fetish" nor the word "panties" was

24  mentioned.  (ECF No. 30-13 at 52-81.)  Notably too, the jury was instructed to consider any out

25  of court statement by petitioner with caution and alongside other evidence.  (See ECF No. 30-3 at

26  255-56; ECF No. 30-4 at 11-12; ECF No. 30-13 at 97-98.)

27      Given the other evidence in the record, including the ballistics evidence (ECF No. 30-10

28  at 42-79; ECF No. 30-11 at 164-301; ECF No. 30-12 at 3) and the cell phone evidence (ECF No.

30-10 at 149-221; ECF No. 30-11 at 30-94; ECF No. 30-12 at 101-37), for but two examples, fairminded jurists could disagree as to whether the admission of petitioner's statement about his fetish for women's underwear resulted in a substantial and injurious effect on the jury's verdict. <u>Richter</u>, 562 U.S. at 101.

In light of the very brief nature of the reference to petitioner's fetish for women's underwear and the weight of the other evidence establishing petitioner's guilt on the offenses of conviction, any error in the failure of the trial court to exclude the women's underwear fetish evidence was harmless.  Admission of that evidence did not so fatally infect the trial so as to render it fundamentally unfair and in violation of petitioner's constitutional rights.  <u>Jammal v. Van de Kamp</u>, 926 F.2d at 919.

In sum, the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.  28 U.S.C. § 2254(d).  The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Richter</u>, 562 U.S. at 103. Therefore, the claim asserted it ground two of the habeas petition should be denied.

C.  *Motion for Mistrial & Prosecutorial Misconduct*

In ground three, petitioner complains the trial court abused its discretion in denying his motion for mistrial and that the prosecutor committed misconduct in eliciting testimony of a detective concerning a canine search.  (ECF No. 1 at 5, 24-30; ECF No. 26 at 20-24; ECF No. 31 at 23-27.)  Respondent maintains that to the degree petitioner states a federal claim, the state court's decision was reasonable and, therefore, petitioner's claim should be denied.  (ECF No. 29 at 27-31.)

The last reasoned rejection of petitioner's claim is the decision of Third District Court of Appeal on petitioner's direct appeal.  The state court addressed this claim as follows:

> *The Trial Court Did Not Err in Denying Defendant's Motion for a Mistrial*
>
> Defendant next contends that the trial court abused its discretion in denying his motion for a mistrial based on prosecutorial error. We disagree.

Prior to trial, the prosecutor advised the trial court that the police had placed a "... GPS tracking monitor on the defendant's car. Now, the defendant was independently surveilled, but we also have ... GPS coordinates on where he went. It's very prejudicial and probative, because the defendant kept circling the area which Ms. Carlson was ultimately found." The prosecutor explained that after the device was placed on defendant's car, the United States Supreme Court held that the government's attachment of a GPS tracking device to a defendant's vehicle and use of that device to monitor the vehicle's movements on public streets constitutes a search within the meaning of the Fourth Amendment and thus requires a warrant. (*United States v. Jones* (2012) 565 U.S. ——, —— [181 L.Ed.2d 911, 949].) Because the police did not obtain a warrant prior to placing the tracking device on defendant's car, the prosecutor represented that he was "not introducing that evidence into court."

At trial, a series of witnesses testified concerning the efforts that had been made to locate Dalene after she was reported missing on August 8, 2011, including Detective Robert Faine and Officer Pauline Keener. Faine testified that he was present on August 20, 2011, when a canine search was conducted in "[t]he area of Calaveras around Pershing Avenue in the City of Stockton," and on August 27, 2011, when a canine search was conducted in Escalon in the area of Highway 120, Sexton Road, and Lone Tree Road. Faine also testified that Dalene's remains were found several weeks later on the other side of Lone Tree Road, approximately 75 feet from the road. Keener testified that on August 17, 2011, she and a dog trained in detecting human remains assisted in a search along the Calaveras River. She further testified that on September 2, 2011, she participated in a canine search near Jack Tone Road in Manteca.

Shortly after Keener testified, defendant's trial counsel moved for a mistrial. While far from clear, he appeared to argue that Faine's testimony that police searched an area near where Dalene's remains were later discovered would lead jurors to speculate that defendant "gave them some sort of information that the Court's not telling us about or we're not able to know about." Counsel explained, "The problem I have is that just sort of randomly out of nowhere, [on August 27, 2011,] the officers are searching 75 feet away from where the body was found on [October 15, 2011]." Counsel also reminded the court that a tracking device placed on defendant's car following his arrest on August 14, 2011, indicated that defendant's car travelled to the area that was searched on August 27, 2011, but that the prosecutor had represented that such evidence was inadmissible because the police did not have a warrant for the tracking device.

The prosecutor opposed the motion for a mistrial, noting that one could always make the argument that jurors will speculate. He

31

pointed out that there was also testimony concerning searches of areas other than near where the remains were discovered, and that the same argument could be made with respect to these searches. He also explained that the purpose of the challenged testimony was to show that the police employed "all means possible" to locate Dalene during the 67 days she was missing.

The trial court denied the motion. In doing so, the court suggested that one way to address defense counsel's concern would be to ask Faine, "Did you go look in that location because of something that Mr. Gilley told you? The answer would be no." Defense counsel said he did not think the answer would be no "because indirectly that's why they went there." Thereafter, the prosecutor indicated that he would accept a limiting instruction that said something like, "You heard evidence that officers went to various locations, either with boat patrol or with dog evidence, and you're not to speculate why they went there, only that they did go there." Defense counsel did not request a limiting instruction, and none was given.

On appeal, defendant claims that "[e]vidence that the police searched the area near the location where Dalene Carlson's body was eventually discovered was inadmissible as derivative evidence of the illegal GPS tracking device search," and thus, the prosecutor erred in eliciting such evidence. In particular, he points to Faine's testimony regarding the August 27, 2011, search in Escalon in the area of Highway 120, Sexton Road, and Lone Tree Road, and its proximity to the area where Dalene's body was eventually found, and Keener's testimony regarding a September 2, 2011, search near Jack Tone Road in Manteca. Defendant argues that the introduction of such evidence was prejudicial because "the fact that the officers knew to search there, regardless of what they ended up finding, had the potential to cause the jurors to speculate that [the officers] must have learned the location from appellant and that appellant must have been the one to have murdered Dalene."

As a preliminary matter, the People contend that defendant forfeited his claim by failing to object in a timely fashion or request the trial court admonish the jury to disregard the impropriety. (*People v. Valdez* (2004) 32 Cal.4th 73, 122 [to preserve an issue of prosecutorial error for review, defendant must make a timely objection and request an admonition from the trial court].) More particularly, the People argue that defendant did not make any objection until well after the evidence was presented at trial and never requested that the jury be admonished to disregard the perceived error. They also note that defendant's motion for a mistrial was based solely on the testimony of Faine; no objection was made to the testimony of Keener. "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were

32

made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile. [Citations.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Here, defendant argues, "A limiting instruction only would have called attention to the matter more," and therefore, "[t]he only effective remedy would have been a mistrial." Assuming for argument's sake that (1) the tracking device, as opposed to independent surveillance or some other source, led the police to search the area near where Dalene's body was found, (2) evidence police searched the area near where Dalene's body was found weeks before it was found was inadmissible as fruit of the poisonous tree, and thus, the prosecutor erred in eliciting the challenged testimony, and (3) defendant did not forfeit his claim on appeal, the claim still fails because the introduction of the challenged evidence did not irreparably damage defendant's chances of receiving a fair trial (*People v. Smith* (2015) 61 Cal.4th 18, 52 [standard for grant of mistrial] ) or so infect the trial with unfairness as to make the resulting conviction a denial of due process (id. at pp. 51–55 [federal standard for prosecutorial error] ), and it is not reasonably probable defendant would have received a more favorable result had the error not occurred (*People v. Riggs* (2008) 44 Cal.4th 248, 298 [state standard for prosecutorial error] ).

The challenged testimony was brief. The prosecutor did not argue or suggest that defendant led them to the area along Lone Tree Road, nor are we persuaded that the jury would have assumed that such was the case. There are a number of ways that the police could have come to search that location, including information from a witness who saw something on the morning in question, an anonymous tip, or cell phone records. Indeed, evidence was introduced that at 9:57 a.m. on August 7, 2011, Dalene's phone activity was serviced by a cellular tower in the Jack Tone Road area near Manteca. In any event, given the overwhelming evidence of defendant's guilt detailed above, it is not reasonably probable defendant would have received a more favorable result had the prosecutor not introduced evidence that police searched the area several weeks before Dalene's remains were discovered.  [FN. 7 omitted.]

(People v. Gilley, slip op. at *11-14.)

Applicable Legal Standards

The standards pertaining to the admission of evidence were previously provided in the undersigned's discussion regarding ground two of the habeas petition.

//

1    Concerning the allegation of prosecutorial misconduct, the United States Supreme Court

2    has made clear that prosecutors must "refrain from improper methods calculated to produce a

3    wrongful conviction." Berger v. United States, 295 U.S. 78, 88 (1935).  To prevail on a claim of

4    prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or

5    remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due

6    process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Parker v. Matthews, 567 U.S. at 45

7    (confirming that Donnelly/Darden is the proper standard).  And, because "the *Darden* standard is

8    a very general one," courts have "more leeway...in reaching outcomes in case-by-case

9    determinations." Parker, 567 U.S. at 48 (internal quotation marks omitted).  Darden requires a

10   two-step inquiry: whether the prosecutor's actions were improper and, if so, whether they

11   "infected" the trial and rendered it "fundamentally unfair." Drayden v. White, 232 F.3d 704, 713

12   (9th Cir. 2000) (citation omitted).  "[T]he touchstone of due process analysis in cases of alleged

13   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith

14   v. Phillips, 455 U.S. 209, 219 (1982).

15       Assuming a petitioner can establish that the prosecutor engaged in misconduct, habeas

16   relief nevertheless is unwarranted unless the petitioner can show that the misconduct had a

17   substantial and injurious impact on the jury's verdict.  Karis v. Calderon, 283 F.3d 1117, 1128

18   (9th Cir. 2002) (citing Brecht, 507 U.S. at 638); Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir.

19   2004).

20           Analysis

21               *Relevant Background*

22       During proceedings concerning the defense's motions in limine, the prosecutor advised

23   the court that a GPS tracking monitor had been placed on petitioner's vehicle and GPS

24   coordinates were generated as a result of that surveillance.  (ECF No. 30-8 at 69.)  The prosecutor

25   characterized the information as "very prejudicial and probative, because the defendant kept

26   circling the area which Ms. Carlson was ultimately found."  (ECF No. 30-8 at 69.)  However, the

27   United States Supreme Court thereafter decided a case wherein it ruled a search warrant was

28   required in order to place such a tracking device, and the prosecutor indicated a search warrant

34

1    had not been obtained beforehand.  (ECF No. 30-8 at 69.)  As a result, the prosecutor stated he

2    would not be "introducing that evidence into court."  (ECF No. 30-8 at 69-70.)

3         During trial, a number of witnesses testified as to the various efforts made to locate the

4    missing victim.  (See ECF No. 30-8 at 249-62 [Enebrad: missing persons unit, processes], 263-66

5    [Karratti: contacted hospitals, collect victim's mother's DNA], 266-70 [Tracy: photographs taken

6    of 8/14/11 search at Calaveras river that included a dog], 270-75 [Faine: 8/20/11 (Calaveras) &

7    8/27/11 (Escalon) searches with CARTA dogs; grid search in Escalon with Mariposa/Hwy

8    120/Sexton/Lone Tree as its boundaries; Escalon search area boundary 75 feet from area where

9    victim's remains were later found], 275-79 [Keener: 8/17/11 search of Calaveras river with

10   cadaver dogs & 9/2/11 search at Jack Tone Road in Manteca with cadaver dogs].)

11        Thereafter, following additional testimony by two witnesses pertaining to the victim's

12   dental records (ECF No. 30-8 at 279-98), defense counsel moved for mistrial outside the presence

13   of the jury:

14             THE COURT:  … Mr. Bullard, you had a couple of objections.

15             MR. BULLARD: Well, when former detective Faine was called to
16             testify, he talked about a search on August the 20th at Calaveras with
               the dog, I don't [have] any problem with that.

17             But the 27th, October 27th, there was a search done in Escalon
18             essentially bordering on Lone Tree, Sexton and Escalon Belota and
               Highway 120.  Then there were questions about where Ms. Carlson's
19             body was found in the cornfield right off of Lone Tree Road.
               Probably most of this is my fault, but part of the discovery that was
20             provided to me included GPS and tracking evidence that Mr. Gilley
               was arrested on the 14th of August.  He was released on Thursday,
21             which could have been the 17th of August, the 16th or 17th of
               August, that day or at least the very day after, I believe the tracking
22             device was placed on the car.  There was not a warrant for that
               tracking device and there was certain information that was obtained
23             through the tracking, there was some information that was obtained
               through actual surveillance.

24             But Mr. Himelblau had assured me that he was not going to use any
25             of the information obtained from the - - solely from the tracking
               because there was not a warrant and he did not feel like that evidence
26             would be admissible.

27             Part of what happened is there was some - - the tracking device
               indicated the car had gone out essentially to the area where the
28             officers searched on August the 27th.

The problem I have is that just sort of randomly out of nowhere, the officers are searching 75 feet away from where the body was found on August the 27th.  Then October the 15th her body is found by the property owner.

To me it sure looks like  - - I don't think there's going to be any other explanation or why the officers went out and searched that area - - and to me it sure looks like we're keeping something from the jurors in that regard.

So I'm going to move for mistrial.  I don't think that we can have that kind of evidence just floating out there with no real connection except to have the jurors speculate that, jeeze, there's got to be a reason why they were searching 75 feet away from her, where she was eventually found in August and it has to be that Mr. Gilley gave them some sort of information that the Court's not telling us about or we're not able to know about.

So based on that, I'll move for mistrial.

THE COURT: Response, Mr. Himelblau.

MR. HIMELBLAU:   Well, I don't think that's a natural understanding - - well, let me agree with lots of things that Mr. Bullard said.

There was a tracking device.  I thought we talked abut this in motions but possibly not.

THE COURT:  Briefly.

MR. HIMELBLAU: There was a tracking device.  This is before the [Supreme] Court case come out, I think it's *Jones* - - [4]

MR. BULLARD: *Jones.*

MR. HIMELBLAU:  - - which requires a search warrant to be produced to be able to do that.  I told Mr. Bullard I'm not going to use it because we don't do a warrant so we can't use it.

All the evidence today was the efforts by the police officers on [what] essentially was a no-body case for 67 days, a no-body case for 67 days.  In particular, the dog search efforts of the police department to go to all sorts of different places with volunteers and CSOs to be able to go and see if they could have some indication whether she was here, whether she was there.

So that's why the evidence was very broad.  I excluded his house because we already had - - I already told the Court I wouldn't bring in cadaver dog hit evidence and there was a cadaver dog hit at Mr. Gilley's house that Officer Keener and her dog Haley went to.

---

[4] <u>United States v. Jones</u>, 565 U.S. 400 (2012), was decided on January 23, 2012, after the GPS device was placed on petitioner's vehicle and before the trial in this matter was conducted.

1

2

But we have CARTA at Lone Tree, at Calaveras. We have Keener back at Calaveras and in Manteca. There are all effortless places.

3

4

5

I had to have Detective Faine explain where the body was in location to the very northwest corner of [the] search grid to show that they didn't go into that area, less the jury think that the - - or the evidence would allow counsel to argue that the body was dumped there after August 27th, which completely goes against everything that I would be arguing with the other evidence so I had to put in some type of relationship.

6

7

8

9

But the dog evidence is equally as compelling as the evidence of Patricia Enebrad, I'm talking about all the efforts she did; Officer Karratti saying that she called all the hospitals; the media blitz that they put out there, the FaceBook; Detective Burrell hadn't testified yet, but he'll testify he called Amtrak and calling ICE, calling Greyhound, calling former employers to determine where is Dalene.

10

11

12

13

And that's all this jury is going to understand and that's all I'm going to argue was the import of that as we looked and we looked and we looked for two months. The defendant knowing we were looking, he stuck to the Modesto story, and she wasn't found until the 15th, and that is Dalene Carlson, that was the import of the dog evidence, and I think - -

14

Well, anyway, I would submit it.

15

THE COURT:  All right.

16

17

18

19

MR. BULLARD:  Well, the problem I have is that it makes sense that they would be searching the hospitals.  It makes sense they would be searching, you know, where she may have been.  It doesn't make sense that we're searching out in the middle of Escalon except there's a reason for it. They didn't just drop - - they didn't just suddenly arrive there and start searching. There absolutely was a reason for it and to be searching in that particular area.

20

21

22

The problem I have now is it's just hanging out there with no, nothing to connect it to, except to speculate that, Well, again, there's a reason why they went out there.  As a juror we don't know what it is, but there's a reason they went there. They didn't stop what they were doing one day and say "Let's go search this corner of Escalon" for no reason whatsoever.

23

24

25

26

THE COURT:  Well, maybe you can do some research and see if you can provide me some cases that - - I mean, evidence gets excluded all the time and I think there's lots of situations where jurors are wondering where did that come from? or why is there a leap between this point A and point C or D, what happened in between? Sometimes it's because of stipulation by counsel. Sometimes it's because of rulings of the Court.

27

28

I don't see at this point rising to the level of a mistrial, but if you find some case law, I definitely will read it and go through the analysis.

37

1    So I'll also do some research tonight and I'll reserve on this issue.

2    (ECF No. 30-8 at 302-07.)  The following morning, before the jury was brought in, the court

3    asked defense counsel for any additional thoughts:

4

5    MR. BULLARD:  Well, your Honor, I think the basis of the mistrial
     motion is prosecutorial misconduct in that this was an area that I
     knew Mr. Himelblau knew regarding the tracking evidence, knew

6    that he was not going to be able to get into it.  It's seems to me it's
     an end around that by introducing this evidence of this search literally

7    175 feet, 100 feet away from where Ms. Carlson was eventually
     found.  And, again, what we are left with is this is just sort of hanging

8    out there. There is no real connection as to why it was that they went
     and searched there. And I think the - - it's left open to speculation

9    that, "Well, they must have done it for a reason.  The reason they did
     it had something to do with Mr. Gilley."  And that, to me, is really

10   damning speculation.

11   So that's the basis for the motion for mistrial.

12   THE COURT: Mr. Himelblau.

13   MR. HIMELBLAU:   And just as I said yesterday, it's not being
     offered for that.  I don't know why they would just speculate.  They

14   could make an argument they would always speculate.  They are told
     not to speculate.  It is subsumed and part and parcel of other areas

15   where dog searches were done, where Mr. Gilley was found, and you
     can make the same argument.  And the reason for that was the efforts

16   made over the - - the - - the sixty-seven days that Ms. Carlson lay out
     there to go find her using all means possible, including media,

17   searching hospitals, media releases, talking to witnesses, and taking
     the dogs out looking for her body where they think - - related to

18   where they wanted to go, for whatever reason, which may or may not
     bore fruit.  And that - - yeah, so that was four - - four places were

19   introduced.

20

21   (ECF No. 30-9 at 3-4.)  Following an offer by the prosecution to stipulate to the jury receiving a

22   limiting instruction that they were not to speculate about the reason the particular area was

23   searched (ECF No. 30-9 at 4-5), which defense counsel did not comment upon or request be

24   given, the trial court denied the "motion for mistrial based on prosecutorial misconduct."  (ECF

25   No. 30-9 at 5.)

26   *Discussion & Finding*

27   The question before this court is whether the state appellate court's determination  - that

28   there was no prosecutorial misconduct requiring a mistrial - was reasonable in accordance with,

38

1    and not contrary to, Supreme Court precedent.

2          It was reasonable for the state appellate court to determine that, assuming for the sake of

3    argument the prosecutor committed misconduct by eliciting testimony concerning the search of

4    the Escalon area that occurred prior to discovery of the victim's body (subsequently found about

5    seventy-five feet from a boundary employed during the Escalon search), admission of the

6    evidence did not so unfairly infect the trial so as to make petitioner's conviction a denial of due

7    process, nor did the prosecutor's conduct have a substantial and injurious impact on the jury's

8    verdict.

9          Detective Faine's testimony concerning the Escalon area is very brief, encompassing

10   about five pages of the total trial transcript.  That testimony, considered with the other testimony

11   concerning the efforts made to locate the victim, could reasonably have been interpreted by the

12   jury to have come about as the result of, as the state appellate court noted, cell phone records, an

13   anonymous tip or a witness statement.  Richter, 562 U.S. at 101.  Certainly no mention is made of

14   a GPS tracking device or petitioner having traveled to the Lone Tree Road location.  Petitioner

15   cannot establish a substantial and injurious effect or influence on the jury's verdict where the

16   record establishes there was substantial evidence of his guilt.  As noted previously, that evidence

17   included ballistics evidence, cell phone records, surveillance video footage, and petitioner's

18   admissions.  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Brecht, 507 U.S. at 637-

19   38) (establishing that relief is limited to when the petitioner can establish that the misconduct

20   resulted in actual prejudice).

21         Under all the circumstances of this case, the undersigned agrees with respondent that

22   reasonable jurists could have concluded, as did the state courts, that the testimony elicited by the

23   prosecutor concerning the canine search in Escalon, even if properly considered misconduct, did

24   not have a substantial and injurious effect on the jury's verdict.  Brecht, 507 U.S. at 637; Richter,

25   562 U.S. at 106.  Accordingly, no federal due process violation occurred.  The claim should be

26   denied as petitioner is not entitled to relief.

27   ////

28   ////

D. *Jury Instruction CALCRIM No. 224*

In ground four, petitioner argues the trial court failed to instruct the jury with CALCRIM No. 224 as required.  (ECF No. 1 at 31-35; ECF No. 26 at 24-27; ECF No. 31 at 27-30.) Respondent contends that petitioner has failed to raise a federal claim.  (ECF No. 29 at 31-34.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> *The Trial Court Was Not Required to Instruct with CALCRIM No. 224*
>
> Defendant next contends that the trial court erred by failing in its sua sponte duty to instruct the jury in the language of CALCRIM No. 224 because the prosecution's case rested substantially on circumstantial evidence. We disagree.
>
> The trial court did not instruct the jury with CALCRIM No. 224. Instead, as agreed to by the parties, the court instructed with CALCRIM Nos. 223 (general instruction on direct and circumstantial evidence) and 225 (use of circumstantial evidence to find requisite intent or mental state).
>
> The trial court has a sua sponte duty to instruct with CALCRIM No. 224 "where the prosecution's case rests substantially on circumstantial evidence [citation], but it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence [citation]." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 (*Heishman*); Bench Notes to CALCRIM No. 224 (2011) p. 56.)
>
> We agree with defendant that the prosecution's case rested largely, if not entirely, on circumstantial evidence. As defendant points out, the prosecution's evidence included surveillance videos, defendant's admissions, and ballistics evidence. This circumstantial evidence, however, was not consistent with a reasonable conclusion of innocence, and therefore the trial court had no duty to instruct the jury with CALCRIM No. 224. (*Heishman, supra*, 45 Cal.3d at p. 167.) Surveillance video showed defendant and Dalene outside Finnegan's Bar at 1:15 a.m. Defendant admitted that after leaving the bar and purchasing a bottle of alcohol, he and Dalene went to his house, consumed the bottle of alcohol, and had sex. Defendant further admitted that after they had sex, Dalene became upset, left to walk home, and that he picked her up in his grandmother's car. Ballistics evidence indicated that the cartridge cases found at the

crime scene were fired from defendant's gun.

On this record, the trial court was not required to instruct with CALCRIM No. 224. (*Heishman, supra*, 45 Cal.3d at p. 167.)

(People v. Gilley, slip op. at *14.)

Applicable Legal Standards

Claims of error in state jury instructions are generally matters of state law and thus do not usually invoke a constitutional question. See Gilmore v. Taylor, 508 U.S. 333, 343 (1993). And, the federal court is bound by a state appellate court's interpretation of California state law. See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state law questions").

To merit federal habeas relief when an allegedly erroneous jury instruction is given, or an instruction is omitted, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 71-72; Henderson v. Kibbe, 431 U.S. 145, 155 (1977); see also Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.1988) (state court's failure to give jury instruction "does not alone raise a ground cognizable in a federal habeas corpus proceeding"). Where the alleged error is the failure to give an instruction, the burden on the petitioner is "'especially heavy'" because "an omission ... is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. at 155.

In a criminal trial, a jury instruction violates due process if it fails to give effect to the requirement that the State prove every element of the offense. Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citing Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979)).

Claims of instructional error must be evaluated in the context of the instructions as a whole, not in artificial isolation. Estelle, 502 U.S. at 72; United States v. Frady, 456 U.S. 152, 169 (1982). Moreover, a petitioner is not entitled to habeas relief unless an error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637-38; see also Clark v. Brown, 450 F.3d 898, 905 (9th Cir. 2006) ("A habeas petitioner

must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict'"), cert. denied, 549 U.S. 1027 (2006).  "A 'substantial and injurious effect' means a 'reasonable probability' that the jury would have arrived at a different verdict had the instruction been given."  Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir. 2009) (quoting Clark, 450 F.3d at 916).  A federal court's review of a claim of instructional error is highly deferential.  Masoner v. Thurman, 996 F.2d 1003, 1006 (9th Cir. 1993).

Analysis

*Relevant Background*

The Clerk's Transcript on Appeal reflects that CALCRIM No. 224 was not given and is marked as "withdrawn."  (See ECF No. 30-4 at 46.)  During the trial, the following exchange occurred concerning the relevant instruction:

> THE  COURT:  207,  proof  of  actual  date,  that  will  be  given. Requested by the People.
>
> 220, reasonable doubt, that will be given.
>
> 222, given.
>
> 223, given.
>
> And  I  believe  we  talked  about  informally  that  224  would  be withdrawn.
>
> MR. HIMELBLAU:  Correct.
>
> THE  COURT:   So in its place,  are both sides requesting  225, circumstantial evidence, intent or mental state?
>
> MR. HIMELBLAU:  Yes.
>
> MR. BULLARD:  Yes.
>
> THE COURT:  So 225, that will be given.

(ECF No. 30-12 at 144.)

*Discussion & Finding*

As noted previously, a federal writ is not available for alleged error in the interpretation or application of state law.  Wilson v. Corcoran, 562 U.S. at 5; Estelle v. McGuire, 502 U.S. at 67-68.  Alleged erroneous state jury instructions are generally matters of state law and do not

typically invoke a constitutional question.  Gilmore v. Taylor, 508 U.S. at 343.  A federal court is bound by a state appellate court's interpretation of California state law.  Waddington v. Sarausad, 555 U.S. at 192 n.5.  This court is bound by the Third District Court of Appeal's interpretation of California state law, including whether the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 224.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Estelle v. McGuire, 502 U.S. at 71-72.  In any event, petitioner cannot show a violation of his federal due process rights.

CALCRIM No. 224 provides as follows:

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

> Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

CALCRIM No. 225 provides:

> The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required.

> A[n] (intent/ [and/or] mental state) may be proved by circumstantial evidence.

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

> Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state)

43

1
2

> was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

3

4  (See ECF No. 30-13 at 90-91.)  It appears CALCRIM No. 225 is more narrowly tailored to the

5  jury's consideration of circumstantial evidence regarding a defendant's mental state, whereas

6  CALCRIM No. 224 applies more broadly to the jury's consideration of both a defendant's acts

7  and his mental state.

8  The undersigned finds no basis for disagreeing with the California Court of Appeal's

9  conclusion that the trial court was not required to sua sponte give CALCRIM No. 224, and

10  petitioner cannot establish that the omission of such instruction rendered his trial fundamentally

11  unfair.  The jury was instructed regarding reasonable doubt (CALCRIM No. 220; ECF No. 30-3

12  at 238; ECF No. 30-13 at 88), direct and circumstantial evidence:  defined (CALCRIM No. 223;

13  ECF No. 30-3 at 240; ECF No. 30-13 at 89-90) and circumstantial evidence: intent or mental state

14  (CALCRIM No. 225; ECF No. 30-3 at 241; ECF No. 39-13 at 90-91).  These instructions

15  foreclose any finding that the failure to instruct the jury with CALCRIM No. 224 resulted in a

16  "substantial and injurious effect or influence" on the jury's verdict.  Brecht, 507 U.S. at 637-38.

17  As for any specific contention that the trial court's failure to instruct the jury with

18  CALCRIM No. 224 lessened the People's burden of proof, that is not the case.  The trial court

19  instructed the jury pursuant to CALCRIM 220, which clearly instructed the jury on the

20  prosecution's burden of proof.  (ECF No. 30-13 at 88.)  See Estelle, 502 U.S. at 72 (a single jury

21  instruction should not be judged in artificial isolation, but must be considered in the context of the

22  instructions as a whole).  This court must also assume in the absence of evidence to the contrary

23  that the jury followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000);

24  Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

25  law that jurors follow their instructions").  There is no evidence in this record to indicate the jury

26  did not follow the court's instructions.

27  After a review of the record, the undersigned finds that the decision of the California

28  Court of Appeal that petitioner was not prejudiced by the trial court's failure to instruct the jury

1   with CALCRIM No. 224 is not contrary to or an unreasonable application of federal law.  Given

2   the evidence of petitioner's guilt, albeit circumstantial and noted in these findings, the trial court's

3   failure to give CALCRIM No. 224 did not render petitioner's trial fundamentally unfair or have a

4   substantial and injurious effect on the verdict.  Accordingly, petitioner's claim as alleged in

5   ground four should be denied.

6          E.  *Petitioner's Right to be Present During Readback Testimony*

7          In ground five, petitioner asserts constitutional error where the trial court refused to allow

8   readback of witness testimony requested by the jury to be completed in his presence.  (ECF No. 1

9   at 36-39; ECF No. 26 at 28-29; ECF No. 31 at 30-32.)  Respondent maintains the state court's

10  decision was reasonable and that petitioner's claim must be denied.  (ECF No. 29 at 34-36.)

11         The Third District Court of Appeal addressed this claim on direct appeal as follows:

12             *The Trial Court Did Not Err in Allowing Testimony to Be Read*
13             *Outside the Presence of Defendant and His Trial Counsel*

14         Defendant next claims that the trial court committed reversible
15     federal constitutional error when it overruled defense counsel's
       objection and allowed testimony to be read back to the jury when
16     neither he nor his attorney was present. He is mistaken.

17         During deliberations, the jury requested a read back of Yoshida's
       testimony regarding ballistics. The trial court advised the parties that
18     it intended to have the requested testimony read back to the jury.
       Defendant's trial counsel objected to the testimony being read back
19     to the jury outside his or defendant's presence. The trial court
       overruled the objection, citing *People v. McCoy* (2005) 133
20     Cal.App.4th 974, 982 (*McCoy*) for the proposition that the United
       States Supreme Court "has never held that allowing a readback of a
21     witness testimony outside of the presence of a defendant and his
22     attorney is a violation of the Federal Constitution."

23         The trial court was correct. In *McCoy*, the Court of Appeal observed
       that the United States Supreme Court has never held that allowing a
24     readback of witness testimony outside the presence of a defendant
       and his attorney is a violation of the federal constitution. (*McCoy,*
25     *supra*, 133 Cal.App.4th at p. 982.) California Supreme Court
       decisions that have considered the issue have uniformly held there is
26     no federal or state constitutional violation when a readback occurs
       outside the presence of a defendant or his attorney because the
27     rereading of testimony is not a critical stage of the proceedings.
28     (*People v. Butler* (2009) 46 Cal.4th 847, 865; *People v. Cox* (2003)

30 Cal.4th 916, 963, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Ayala* (2000) 23 Cal.4th 225, 288; *People v. Horton* (1995) 11 Cal.4th 1068,1120–1121; see also *People v. Pride* (1992) 3 Cal.4th 195, 251 [no violation of a defendant's rights to counsel and due process even though "no one was present (the court, counsel, or defendant) to monitor or report the readback"].)

Defendant acknowledges that we are required to follow decisions of the California Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), but observes that the Ninth Circuit "has held that a criminal defendant has a right to be personally present at the read-back of testimony and this right must be enforced unless personally waived." (See, e.g., *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, 917, overruled on another ground by *Payton v. Woodford* (9th Cir. 2003) 346 F.3d 1204, 1218, fn. 18; *Shewfelt v. Alaska* (9th Cir. 2000) 228 F.3d 1088, 1090–1091; *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 814–815, overruled on another ground by *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 685.) "Even on federal questions, however, Ninth Circuit cases do not bind the state courts. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.)" (*McCoy, supra*, 133 Cal.App.4th at p. 982.) There was no constitutional violation

(People v. Gilley, slip op. at *14-15.)

Applicable Legal Standards

The United States Supreme Court has recognized that "the right to personal presence at all critical stages of the trial ... [is a] fundamental right[] of each criminal defendant." Rushen v. Spain, 464 U.S. 114, 117 (1983); Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (the Constitution guarantees a criminal defendant the right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure"). However, it has never held that a readback is critical stage at which a defendant must be present. La Crosse v. Kernan, 244 F.3d 702, 708 (9th Cir. 2001) ("The Court ... has never addressed whether readback of testimony to a jury is a 'critical stage of the trial' triggering a criminal defendant's fundamental right to be present").

The Ninth Circuit has previously held that the denial of a defendant's right to be present during the readback of trial testimony to the jury is "trial error" subject to harmless error analysis as set forth in Brecht. Hegler v. Borg, 50 F.3d 1472, 1476–78 (9th Cir. 1995). In reaching this

46

1   holding, the Ninth Circuit reasoned that during a readback "the ability of [the defendant] to

2   influence the process [i]s negligible."  Id. at 1477 (citation omitted).  The court in Hegler further

3   observed that "the right of confrontation from which the right of presence is derived in this

4   context [ceases] to be germane," because the witness is also not present, and while it is possible

5   for a defendant to "object[ ] to inaccuracies in the readback, or protest[ ] against any impropriety

6   on the court reporter's part," such mistakes or lapses are "capable of being quantified and assessed

7   in an evidentiary hearing."  Id. (footnote omitted) (citation omitted).  See also Oubichon v. Cate,

8   443 Fed.Appx. 235, 237–238 (9th Cir. 2011) ("A readback of an eyewitness' testimony, without

9   counsel's knowledge or permission, has not been condemned by the Supreme Court .... Without

10   clear guidance from the Supreme Court, we cannot say that the California court's determination ...

11   was contrary to or an unreasonable application of clearly established federal law").

12       Analysis

13           *Relevant Background*

14           On October 1, 2013, the jury sent a note requesting readback of Sarah Yoshida's

15   testimony concerning the ballistics evidence.  (ECF No. 30-3 at 232.)  The trial court replied to

16   the jury's request that same date, indicating the testimony would be read by the court reporter the

17   following morning.  (ECF No. 30-3 at 231; see also ECF No. 30-13 at 127.)

18           The following morning, defense counsel objected to the readback procedure occurring

19   outside the courtroom and outside the presence of petitioner and defense counsel.  (ECF No. 30-

20   13 at 128.)  The trial court denied the request, citing People v. McCoy, 133 Cal.App.4th 974

21   (2005), and its holding "premised on a lack of any authority from the United States Supreme

22   Court suggesting that a court reporter reading testimony to a jury is a critical stage of the

23   proceedings and [that] the California Supreme Court has indicated [readback by a court reporter]

24   is not a critical stage of the proceedings."  (ECF No. 30-13 at 129.)   It also cited to People v.

25   Pride, 3 Cal.4th 195 (1992), noting "no violation of defendant's right to counsel and due process,

26   even though no one was present, the court, counsel, or defendant, to monitor or report the

27   readback."  (ECF No. 30-13 at 130.)  After further discussion, the court advised the jury that the

28   court reporter would read Ms. Yoshida's testimony in the jury deliberation room.  (ECF No. 30-

1   13 at 133.)  It cautioned the jury they should not deliberate in the court reporter's presence and

2   clarified with the jury whether it wished to include that portion of Yoshida's testimony

3   concerning her qualifications.  (ECF No. 30-13 at 133-34.)

4                    *Discussion & Finding*

5          The "privilege of presence is not guaranteed when presence would be useless, or the

6   benefit but a shadow."  Stincer, 482 U.S. at 745 (citation & internal quotation marks omitted).  In

7   this matter, petitioner and defense counsel were made aware of the jury's note and their request

8   for a readback of Ms. Yoshida's ballistics evidence testimony.  The state appellate court

9   determined that the trial court's denial of defense counsel's request regarding the readback was

10  "correct" and that petitioner's reliance upon Ninth Circuit authority in that proceeding was not

11  binding.

12         The Ninth Circuit's holding in Fisher v. Roe, 263 F.3d 906 (9th Cir. 2001) (overruled on

13  other grounds by Payton v. Woodford, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003) (en banc),

14  overruled by Brown v. Payton, 544 U.S. 133 (2005)), is not controlling.  First, Ninth Circuit

15  authority in the absence of controlling United State Supreme Court precedent does not operate to

16  allow this court to grant relief.  See Marshall v. Rodgers, 569 U.S. at 64.  Second, in Fisher, the

17  Ninth Circuit found that the readback of critical testimony during jury deliberations without the

18  knowledge or participation of petitioners and counsel violated petitioners' due process rights and

19  was contrary to clearly established federal law.  Id. at 917.

20         The court in Fisher however, acknowledged that the inquiry as to whether a defendant's

21  rights will be adversely affected by his absence from a readback is fact-sensitive, and limited its

22  holding to the facts before it.  Id.  Unlike the situation in Fisher, here, counsel was aware of the

23  readback, made his objection on the record, and was present when the trial court addressed the

24  jury, informing it the readback would take place in the deliberation room and be read by the court

25  reporter.

26         In short, the Third District Court of Appeals thus did not issue "a decision that was

27  contrary to, or involved an unreasonable application of, clearly established Federal law, as

28  determined by the Supreme Court of the United States."  28 U.S.C. § 2253(d)(1); see also La

                                        48

1    Crosse, 244 F.3d at 708 ("Given the divergence of opinion on this issue and the lack of clear

2    guidance from the United States Supreme Court, we cannot say that the California court's

3    determination [that defendant did not need to be present during readback] was contrary to or an

4    unreasonable application of clearly established federal law").  At a minimum, fairminded jurists

5    could disagree as to whether the state appellate court's holding was correct.  Richter, 562 U.S. at

6    101.  As a result, petitioner's claim as alleged in ground five should be denied.

7                        F.  *Ineffective Assistance of Counsel*

8            In ground six, his final claim for relief, petitioner asserts defense counsel was ineffective

9    during pretrial, trial and sentencing proceedings.  (ECF No. 1 at 39-46.)  Respondent replies the

10   state court's determination there was no ineffective assistance of counsel was reasonable.  (ECF

11   No. 29 at 37-38.)

12           Petitioner presented this claim to the California Supreme Court in a petition for writ of

13   habeas corpus.  (ECF No. 30-24.)  The state's highest court summarily denied the petition on the

14   merits with citations to People v. Duvall , 9 Cal.4th 464 (1995), and Ex Parte Swain, 34 Cal.2d

15   300 (1949).  (ECF No. 30-25.)

16           Applicable Legal Standards

17           To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his

18   trial counsel's performance "fell below an objective standard of reasonableness" and that "there is

19   a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

20   would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

21           Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

22   failed to meet an objective standard of reasonableness.  Strickland, 466 U.S. at 687.  There is "a

23   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

24   professional assistance."  Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at

25   689).  Petitioner must rebut this presumption by demonstrating that his counsel's performance

26   was unreasonable under prevailing professional norms and was not the product of "sound trial

27   strategy."  Strickland, 466 U.S. at 688-89.  Judicial scrutiny of defense counsel's performance is

28   "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

                                        49

1   the time it occurred, without the benefit of hindsight.  Id. at 689.  "[S]trategic choices made after

2   thorough investigation of law and facts relevant to plausible options are virtually

3   unchallengeable." Strickland, 466 U.S. at 690.

4       The second prong of the Strickland test requires a petitioner to show that counsel's

5   conduct prejudiced him.  Strickland, 466 U.S. at 691-92.  Prejudice is found where "there is a

6   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

7   would have been different." Id. at 694.  A reasonable probability is one "sufficient to undermine

8   confidence in the outcome." Id. at 693.  "This does not require a showing that counsel's actions

9   'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice

10   standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

11   Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693).  "The likelihood of a different

12   result must be substantial, not just conceivable." Id.

13       Analysis

14       Petitioner specifically argues that defense counsel had "done no investigation or

15   reasonable investigation" during pretrial proceedings, that during trial defense counsel "utterly

16   failed to defend petitioner against the charges" he faced, and at sentencing counsel failed to

17   present any mitigating factors.

18       *Investigation & Preparation*

19       Petitioner makes a broad claim that defense counsel failed to investigate or prepare for

20   trial, failed to "interview ready and willing available witnesses" who would have potentially

21   aided the defense, failed to hire a DNA expert that the women's underwear found in petitioner's

22   home did not belong to the victim and that his DNA was not found on the victim's body or "other

23   areas," and failed to hire an investigator "to demonstrate" that had petitioner fired a weapon

24   because "gun powder residue would have been found on" his clothing and yet no such residue

25   was found.  (ECF No. 1 at 40-41.)

26       As to petitioner's broad claim of defense counsel's failure to investigate and prepare for

27   trial, and failure to interview unidentified witnesses, the claim is conclusory and unsupported and

28   should be rejected as such.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).  See also Jones v.

Gomez, 66 F.3d 199, 205 (9th Cir. 1995) ("conclusory suggestions" and "bald assertions" fall short of stating an ineffective assistance of counsel claim and do not entitle the petitioner to an evidentiary hearing); Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (petitioner failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the witness would have given helpful information); Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no evidence concerning what counsel would have found had he investigated further, or what lengthier preparation would have accomplished).

As to the claim defense counsel should have hired a DNA expert, the claim is unavailing. The record reveals that testimony was elicited during the defense case that the women's underwear seized from petitioner's home did not belong to the victim.  (ECF No. 30-12 at 73-85 [DOJ DNA Analyst Gresham].)  Defense counsel was not required to present the testimony of another DNA expert where one had already tested the women's underwear and the results were exculpatory to petitioner.  See, e.g., Boutte v. Biter, 556 Fed. Appx. 623, 625 (9th Cir. 2014) ("The absence of evidence that was cumulative of what had already been presented ... does not undermine our confidence in the outcome," quotations & citation omitted); Matylinsky v. Budge, 577 F.3d 1083, 1097 (9th Cir. 2009) (holding that petitioner "cannot show prejudice for failure to present what is most likely cumulative evidence").  Petitioner's trial counsel may well have decided that additional expert testimony on this issue was unnecessary.  Such a tactical decision would not have been unreasonable under the circumstances of this case and thus does not constitute deficient performance.  See Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").  The record demonstrates that defense counsel argued in closing that the women's underwear found in petitioner's home did not belong to the victim.  (ECF No. 3-13 at 41-42.)

Petitioner fails to explain how an investigator would have been of assistance to a claim of a lack of gun powder residue.  Notably, the record reveals that a lack of gun powder residue was argued by defense counsel to support a conclusion that the prosecution had failed to establish

1   petitioner's guilt beyond a reasonable doubt.  (See ECF No. 30-12 at 285.)  Therefore, fairminded

2   jurists could conclude that counsel's purported failure to retain an investigator or expert on the

3   issue of gun powder residue was not a failure of representation, but a reasonable trial strategy or

4   tactic.  Strickland, 466 U.S. at 690.

5                                *Sentencing/Mitigation*

6          At sentencing, defense counsel did not argue any circumstance in mitigation or any other

7   mitigating circumstance.  The trial court, in sentencing petitioner to life without the possibility of

8   parole plus a consecutive term of twenty-five years to life, made the following statements:

9              THE COURT:  … I should note for the record that even if the Court
               was allowed by law to grant probation, I would not do so based on
10             the circumstances in aggravation pursuant to California Rules of
               Court 4.414, as well as 4.420 and 4.421;
11

12             That this crime involved great violence, great bodily harm, or other
               acts disclosing a high degree of cruelty, viciousness, or callousness;

13             That the defendant was armed with a firearm at the time of the
               commission of the crime;
14

15             That Dalene Carson was particularly vulnerable;

16             That the manner in which the crime was carried out indicated
               sophistication or professionalism;

17             And that the defendant took advantage of a position of trust or
               confidence to commit the crime.
18

19             I did also consider the fact that Mr. Gilley has no prior record
               pursuant to the factors in mitigation with respect to California Rule
20             of Court 4.423. So even if I did have that discretion, I would be
               denying probation.

21   (ECF No. 30-13 at 161.)

22          California Rules of Court, rule 4.414 concerns the Criteria affecting probation, rule 4.420

23   concerns the Selection of term of imprisonment, rule 4.421 concerns the Circumstances in

24   aggravation, and 4.423[5] concerns the Circumstances in mitigation.

25   _____
     [5] (a) Factors relating to the crime
26        Factors relating to the crime include that:
          (1) The defendant was a passive participant or played a minor role in the crime;
27        (2) The victim was an initiator of, willing participant in, or aggressor or provoker of the
          incident;
28        (3) The crime was committed because of an unusual circumstance, such as great

                                        52

1    First, the undersigned notes petitioner's claim that defense counsel failed to "present any

2   mitigating factors" is vague and conclusory as he made no effort to identify what mitigating

3   factors should have been presented.  Conclusory allegations are insufficient to warrant habeas

4   relief.  <u>James v. Borg</u>, 24 F.3d at 26.  In any event, a fairminded jurist could conclude counsel

5   was not ineffective because the court did in fact consider the only relevant and applicable

6   mitigating factor: petitioner's lack of criminal record.  (Cal. Rules of Court, rule 4.423(b)(1).)

7   None of the other factors listed in rule 4.423 apply.  (<u>See</u> Cal. Rules of Court, rule 4.423(a)(1)-(9)

8   & (b)(2)-(6).)  Because no other mitigating factors apply, defense counsel cannot be faulted for

9   failing to "present any mitigating factors."  <u>See Rupe v. Wood</u>, 93 F.3d 1434, 1444-45 (9th Cir.

10   ────────────────────

provocation, that is unlikely to recur;

11   (4) The defendant participated in the crime under circumstances of coercion or duress, or the criminal conduct was partially excusable for some other reason not amounting to a

12   defense;

(5) The defendant, with no apparent predisposition to do so, was induced by others to

13   participate in the crime;

(6) The defendant exercised caution to avoid harm to persons or damage to property, or

14   the amounts of money or property taken were deliberately small, or no harm was done or

15   threatened against the victim;

(7) The defendant believed that he or she had a claim or right to the property taken, or for

16   other reasons mistakenly believed that the conduct was legal;

(8) The defendant was motivated by a desire to provide necessities for his or her family or

17   self; and

(9) The defendant suffered from repeated or continuous physical, sexual, or psychological

18   abuse inflicted by the victim of the crime, and the victim of the crime, who inflicted the

19   abuse, was the defendant's spouse, intimate cohabitant, or parent of the defendant's child; and the abuse does not amount to a defense.

20   (b) Factors relating to the defendant

Factors relating to the defendant include that:

21   (1) The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes;

22   (2) The defendant was suffering from a mental or physical condition that significantly

23   reduced culpability for the crime;

(3) The defendant voluntarily acknowledged wrongdoing before arrest or at an early stage

24   of the criminal process;

(4) The defendant is ineligible for probation and but for that ineligibility would have been

25   granted probation;

(5) The defendant made restitution to the victim; and

26   (6) The defendant's prior performance on probation, mandatory supervision, postrelease

27   community supervision, or parole was satisfactory.

Any other factors statutorily declared to be circumstances in mitigation or that reasonably

28   relate to the defendant or the circumstances under which the crime was committed.

53

1  1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not

2  constitute ineffective assistance of counsel).  The trial court made clear the aggravating factors

3  outweighed the applicable mitigating factor. [6]

4          Put in Strickland terms, the undersigned cannot say that, had counsel proffered

5  "mitigating factors," the outcome would more likely than not have been more favorable to

6  petitioner.  Hence, in the undersigned's independent review, it cannot be concluded that the state

7  court adjudication was objectively unreasonable.  Himes v. Thompson, 336 F.3d at 853.

8  Petitioner's claim in this regard should be denied.

9                          *Failure to Defend*

10         Petitioner also claims that "defense counsel present[ed] no defense what so ever," failing

11  "to present the prosecution's case to a meaningful adversarial testing process . . .."  (ECF No. 1 at

12  45.)  This claim is belied by the record.  The undersigned has read the record in its entirety.

13  Defense counsel's strategy for countering the prosecution's case in part consisted of challenging

14  the ballistics evidence as testified to by Ms. Yoshida (ECF No. 30-13 at 42-48) and the cell phone

15  evidence as testified to by Jim Cook (ECF No. 30-12 at 291-02; ECF No. 30-13 at 3-6, 18-23, 28-

16  30).  Defense counsel expressly argued the ballistics evidence was unreliable and inaccurate, and

17  that the cell phone evidence was similarly flawed.  Counsel also challenged the lack of scientific

18  testing regarding physical evidence searched and/or seized.  (ECF No. 30-12 at 285-86.)  Further,

19  he challenged the reasonable conclusions that could be made from circumstantial evidence

20  presented.  (ECF No. 30-12 at 278-83, 287, 290-91; ECF No. 30-13 at 16-18.)  Simply stated, the

21  arguments made by defense counsel accord with the strategies counsel employed throughout the

22  trial.

23         Petitioner's assertion that counsel's representation "so utterly failed to defend petitioner

24  against the charges that the trial was the fun[c]tional equivalent of a guilty plea" (ECF No. 1 at

25  39) is wholly without merit.  Neither does this record support petitioner's claim that counsel

26

27  ───────────────

[6] Where the special circumstance of kidnapping during a first degree murder was found true, the applicable punishments are the death penalty and life in prison without the possibility of parole.

28  Cal. Pen. Code, § 190.2.

"acted with reckless disregard" for petitioner's best interest (ECF No. 1 at 41).

### Victim's Boyfriend

On page 44 of his petition, petitioner argues that defense counsel failed to investigate "the victim's relation to the witness used by the prosecution" and that that witness "was the victim's boyfriend, who had been dumped by the victim."  Again, the record belies petitioner's assertion.

Although not expressly named by petitioner, two prosecution witnesses had a relationship with the victim at or near the time of her disappearance: James Cosens (ECF No. 30-9 at 29-111) and Jacob Evangelisti (ECF No. 30-9 at 112-168).  On cross-examination of James Cosens, defense counsel questioned the witness about his relationship with the victim and his knowledge of Mr. Evangelisti's relationship with her, to wit:  ECF No. 30-9 at 34, 46-50, 52, 56-58.  During cross-examination of Jacob Evangelisti, defense counsel inquired into whether the witness's relationship with the victim was, as the witness characterized it, "unknown" and "complicated" as of August 6, 2011, due to the victim's recent interactions with James Cosens; Evangelisti confirmed that the victim's interest in James Cosens was the cause of their problems, to wit:  ECF No. 30-9 at 136-37, 147.  In sum, nothing in this record indicates defense counsel misunderstood the relationship dynamics involved in the case.

### Summary

On every basis asserted in ground six, petitioner has failed to establish ineffective assistance of trial counsel, on either prong of the two-part Strickland test.  Strickland, 466 U.S. at 687-90.  And in light of the doubly deferential review this court must accord such claims, the undersigned recommends ground six of petitioner's federal habeas petition be denied.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

55

"Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 8, 2020

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Gill1162.157

56